521 P.3d 649
Jan KULMANN, in her official capacity as Mayor of the City of Thornton ; and the City of Thornton, Colorado, a Colorado municipal corporation, Petitioners,
v.Cherish SALAZAR, Respondent.
Supreme Court Case No. 22SC135 Supreme Court of Colorado.
December 19, 2022
Attorneys for Petitioners: Berg Hill Greenleaf Ruscitti LLP, Josh A. Marks Rudy, E. Verner, Boulder, Colorado
Attorneys for Respondent: Robert McGuire Law Firm, Robert A. McGuire, III, Denver, Colorado
Attorneys for Amicus Curiae Colorado Municipal League: Robert D. Sheesley, Rachel Bender, Denver, Colorado
En Banc
JUSTICE GABRIEL delivered the Opinion of the Court, in which CHIEF JUSTICE BOATRIGHT, JUSTICE MÁRQUEZ, JUSTICE HART, and JUSTICE SAMOUR joined. JUSTICE HOOD, joined by JUSTICE BERKENKOTTER, dissented.
JUSTICE GABRIEL delivered the Opinion of the Court.
¶1 This case requires us to determine whether the office of Mayor in the City of Thornton constitutes a separate office from that of Councilmember in that city for purposes of article XVIII, section 11(1) of the Colorado Constitution ("section 11"), which restricts individuals from serving "more than two consecutive terms in office." (Emphasis added.)1 This issue is of consequence to the people of Thornton because our resolution of this question determines the applicable term limit for the current Thornton Mayor, petitioner Jan Kulmann.
¶2 Based on the plain language of the Thornton City Charter ("Charter") and Thornton Municipal Code ("Code"), we now conclude that the Mayor and Councilmembers in Thornton serve in distinct offices. Accordingly, we reverse the district court's ruling declaring, as a matter of law, that the Mayor's seat and Councilmembers' seats are part of one elected body and constitute the same office for purposes of section 11's term limit restrictions. In light of this determination, we need not reach the second question on which we granted certiorari.
I. Facts and Procedural History
¶3 Thornton is a Colorado home rule city and municipal corporation. See City of Thornton, Colo., Charter, §§ 1.1, 2.1. Pursuant to its Charter, Thornton employs a "Council-Manager" form of government, under which the City Council serves as the legislative and governing body of the City and the city manager serves as its chief administrative officer. Id. at §§ 2.2, 4.1, 5.4. The City Council consists of "nine (9) members, one of whom shall serve as Mayor." Id. at § 4.1. The eight Councilmembers other than the Mayor are elected from four wards, two per ward, and serve four-year terms. See id. at §§ 4.2(a), 4.3(a). The Mayor, in contrast, is elected at large and serves a four-year term. Id. at § 4.3(b).
¶4 In 2013, Kulmann was elected to Thornton's City Council as a Ward 4 Councilmember. She served a full four-year term in that capacity and was reelected in 2017.
¶5 In 2019, while still serving as a Ward 4 Councilmember, Kulmann ran for and was elected Mayor of Thornton. She thus resigned her position as a Ward 4 Councilmember and was sworn in as Mayor. ¶6 Thereafter, in May 2021, respondent Cherish Salazar, a Thornton resident, taxpayer, and eligible elector, filed the present action against Kulmann and co-petitioner City of Thornton, seeking a declaratory judgment concerning the effect of section 11 on Kulmann's position as Mayor.
¶7 As pertinent here, section 11 provides:
In order to broaden the opportunities for public service and to assure that elected officials of governments are responsive to the citizens of those governments, no nonjudicial elected official of any ... city ... shall serve more than two consecutive terms in office .... For purposes of this Section 11, terms are considered consecutive unless they are at least four years apart. Colo. Const. art. XVIII, § 11 (1) (emphases added).
¶8 Specifically, Salazar sought a declaration that (1) the Mayor's seat and Councilmembers' seats are part of one elected body and constitute the same "office" for purposes of section 11 ; and (2) section 11 prohibited Kulmann from serving a "third term" on the City Council, and thus she was required to vacate her position as Mayor immediately (because her resignation after completing more than half of her second term as Ward 4 Councilmember represented the completion of that term), or, alternatively, no later than November 28, 2021 (the date on which her second consecutive term as Ward 4 Councilmember would have ended but for her resignation).
¶9 The parties cross-moved for summary judgment, and the Adams County District Court ultimately granted Salazar's request for a declaration on the first issue, concluding that the Mayor and the Ward Councilmembers "are not defined or treated so separately so as to justify separate application of Section 11." In reaching this conclusion, the court initially decided that the term "office" in section 11 was ambiguous. The court thus looked to the intent of section 11 as reflected in that provision's declaration of purpose and in statements set forth in the voter Blue Book at the time the amendment adopting section 11 was passed. In the court's view, these sources revealed goals of "prevent[ing] elected officials from viewing their positions as lifetime," "forc[ing] turnover," and "bring[ing] fresh ideas to local governments." The court then concluded that the purpose and intent of section 11 would best be served by construing the positions of Mayor and Councilmember as one office because it would limit the terms someone could serve on City Council regardless of the position held, thereby creating opportunities for more people to serve on the City Council.
¶10 The court found further support for its conclusion in the language of the Charter. In this regard, the court observed that (1) the Charter defines the City Council as "nine (9) members, one of whom shall serve as Mayor"; (2) the Councilmembers and Mayor take the same oath and have the same voting power; (3) the Mayor does not have either a separate budget, separate staff, separate legislative or veto powers, or a right to refuse to sign legislation; and (4) the City Council, and not the Mayor, may enter into contracts on behalf of Thornton and may spend money for capital improvements.
¶11 As to the second issue raised by Salazar, which essentially asked the court to declare that Kulmann's partial second term as a Ward 4 Councilmember constituted a full term for purposes of section ii, the court concluded that Kulmann's partial term did not constitute a full term and therefore Kulmann had served just one term on City Council, with her current term as Mayor constituting her second term.
¶12 Both sides then separately appealed to the court of appeals. Kulmann and Thornton contended that the district court had erred in concluding that the office of Mayor and that of Ward Councilmember are the same "office" for purposes of section 11. Salazar, in turn, contended that the district court had erred in concluding that Kulmann's partial term as a Ward 4 Councilmember was not a full term for term limit purposes. The parties subsequently filed a stipulated motion to consolidate these two appeals, and the court of appeals granted that motion.
¶13 Thereafter, Kulmann and Thornton petitioned this court, pursuant to C.A.R. 50, for certiorari, noting the relative urgency presented by the forthcoming election deadlines. Salazar did not oppose this petition, and we granted it.
II. Analysis
¶14 We begin by setting forth the applicable standard of review and principles of constitutional and legislative interpretation. We then consider whether section 11, and particularly the phrase "in office," is ambiguous. After concluding that it is not, we turn to the plain language of Thornton's Charter and Code, and we conclude that the offices of Mayor and of Councilmember are separate and distinct offices for purposes of section 11.
A. Standard of Review and Principles of Construction ¶15 Constitutional and statutory interpretation present questions of law that we review de novo. All. for a Safe & Indep. Woodmen Hills v. Campaign Integrity Watchdog, LLC, 2019 CO 76, ¶ 20, 450 P.3d 282, 286 ; MDC Holdings, Inc. v. Town of Parker, 223 P.3d 710, 717 (Colo. 2010). The rules of statutory construction apply equally to matters concerning the interpretation of citizen-initiated measures and local government enactments. Huber v. Colo. Mining Ass'n, 264 P.3d 884, 889 (Colo. 2011) ; MDC Holdings, 223 P.3d at 717. ¶16 Our principal goal in interpreting constitutional amendments and local government enactments is to determine and effectuate the intent of those who adopted those measures. See Huber, 264 P.3d at 889 ; MDC Holdings, 223 P.3d at 717 ; JJR 1, LLC v. Mt. Crested Butte, 160 P.3d 365, 370 (Colo. App. 2007). To do so, we look first to the language employed, giving words and phrases their plain and ordinary meanings. People v. Lente, 2017 CO 74, ¶ 16, 406 P.3d 829, 832 ; MDC Holdings, 223 P.3d at 717. In addition, we look to the entire legislative scheme in order to give consistent, harmonious, and sensible effect to all of its parts, and we avoid constructions that would render any words or phrases superfluous or lead to illogical or absurd results. Elder v. Williams, 2020 CO 88, ¶ 18, 477 P.3d 694, 698. ¶17 If the language of the measure is unambiguous, then we apply it as written and need not resort to other tools of construction. Id. If, however, the measure is ambiguous, then we may look to the intent of those who adopted the measure, the circumstances surrounding its adoption, and the possible consequences of different interpretations. Id. A legislative enactment is ambiguous when it is reasonably susceptible of multiple interpretations. Id. ¶18 In conducting the foregoing analysis, we must respect the legislative drafters' choice of language, and we will not add words to a legislative enactment or subtract words from it. UMB Bank, N.A. v. Landmark Towers Ass'n, 2017 CO 107, ¶ 22, 408 P.3d 836, 840. ¶19 In addition, because the right to hold public office is a "valuable and fundamental" right of citizenship, we will construe measures limiting a person's right to hold public office in a way that will least infringe on that right. Romero v. Sandoval, 685 P.2d 772, 774-75 (Colo. 1984).
B. Section 11 ¶20 Section 11 provides, in pertinent part, that "no nonjudicial elected official of any ... city ... shall serve more than two consecutive terms in office." Colo. Const. art. XVIII, § 11 (1). To decide the question presented, we must first determine whether the phrase "in office" is ambiguous. We conclude that it is not.
¶21 As noted above, a provision is ambiguous when it is reasonably susceptible of multiple interpretations. Elder, ¶ 18, 477 P.3d at 698. Here, the phrase "in office" refers back to the phrase "nonjudicial elected official" (i.e., "in office" refers to the office held by a nonjudicial elected official). Colo. Const. art. XVIII, § 11 (1). Accordingly, in our view, "in office" plainly and unambiguously refers to a specific office, and not to an institution or governing body.
¶22 In this regard, this case is distinguishable from Lorton v. Jones, 130 Nev. 51, 322 P.3d 1051 (2014), on which Salazar relies. In Lorton, 322 P.3d at 1052-53, the Nevada Supreme Court considered a state constitutional provision declaring that "[n]o person may be elected to any state office or local governing body who has served in that office, or at the expiration of his [or her] current term if he [or she] is so serving will have served, 12 years or more." (Quoting Nev. Const. art. XV, § 3 (2); alterations in original.) As pertinent to the question before us, the court noted the distinction in the constitutional language between "state office" and "local governing body." Id. at 1056. In the court's view, this distinction indicated that, "at the state level, the drafters intended to prevent election to a specific office, but at the local level, the intent was to preclude continuing service on the governing body generally." Id.
¶23 Section 11 contains no language distinguishing between an office, on the one hand, and a governing body (or institution), on the other. Indeed, section 11 does not refer to a local governing body at all. Rather, it refers solely to an "office." Colo. Const. art. XVIII, § 11 (1). Thus, we conclude that "office" refers to a specific office (i.e., the office held by a nonjudicial elected official), and not to a governing body or institution. See Lorton, 322 P.3d at 1056 (noting that "state office," as distinct from "local governing body," in the pertinent provision of the Nevada Constitution refers to a specific office).
¶24 The question thus becomes whether the offices of Mayor and Ward Councilmember in Thornton constitute the same or separate and distinct offices for purposes of section 11's term limit provisions. To decide this question, we must consider the language of Thornton's Charter and Code.
C. Thornton's Charter and Code
¶25 As Salazar correctly observes, the Charter provides that the City Council consists "of nine (9) members, one of whom shall serve as Mayor," and that the Council "shall constitute the legislative and governing body of the City." City of Thornton, Colo., Charter, § 4.1. Salazar, however, all but ignores the rest of the Charter's language.
¶26 For example, the Charter provides that the Mayor and Ward Councilmembers are elected in different ways and by different constituencies, and they represent different groups of people. Councilmembers are "elected from each ward" to represent their ward-specific constituencies, and they must live in the ward that they represent. Id. at §§ 4.3(a), 4.4. In contrast, the Mayor is elected "at-large" to represent all of the city's residents and can reside in any one of the four wards. Id. at §§ 4.3(b), 4.4. This election process is unlike that in some municipalities, where citizens elect their city council and the council, in turn, designates one of its members to serve as mayor. See, e.g., City of Durango, Colo., Charter, art. II, § 6; see also City of Grand Junction, Colo., Charter, art. V, § 39 (calling the designated member "president," rather than "mayor"). Accordingly, we disagree with Salazar that being a Thornton Councilmember is a "prerequisite" to being Mayor. The Mayor is not elected to be a Councilmember, nor does one become Mayor by being elected to the City Council and then being selected to serve as Mayor. Rather, the voters specifically choose the individual whom they want to serve as their Mayor. Thus, if anything, these provisions support Kulmann's and Thornton's position that the Charter puts the Mayor on the City Council, not a Councilmember in the office of Mayor.
¶27 The Charter further establishes separate and distinct processes for filling vacancies in the offices of Ward Councilmember and Mayor, respectively. If a vacancy occurs in the "office of Councilmember," then the Council appoints an eligible person to fill that vacancy, and the Council must do so within thirty days of the vacancy, unless the vacancy occurs within ninety days of a regularly scheduled election for that vacant seat. City of Thornton, Colo., Charter, § 4.5(b); City of Thornton, Colo., Mun. Code, ch. 2, art. VI, § 2-244. If, in contrast, a vacancy occurs in the "office of Mayor," then the Mayor Pro-Tem becomes the Acting Mayor "immediately" and serves until the next regular election, after which the Acting Mayor resumes their duties as Councilmember for the remainder of their unexpired term in office. City of Thornton, Colo., Charter, § 4.5(a).
¶28 In addition, the Mayor has a number of duties that the Councilmembers do not have, and notwithstanding Salazar's assertions to the contrary, we cannot say that these additional duties are "very minor" and merely "ceremonial or procedural." The Mayor's distinct role within the City of Thornton is detailed in a Charter provision titled, "Mayor," which enumerates the Mayor's unique leadership and legislative responsibilities as well as their independent executive powers. Id. at § 4.8 ("the Mayor Provision"). For example, the first subsection of the Mayor Provision establishes that the Mayor "shall preside over meetings of the Council, shall have the right to speak and vote therein as any other member, shall be recognized as head of the City government for all ceremonial purposes, and shall execute and authenticate legal instruments requiring the signature of the Mayor." Id. at § 4.8(a). The second subsection of the Mayor Provision grants the Mayor executive responsibilities, including emergency and appointment powers that extend beyond their leadership and legislative duties on the City Council. Id. at § 4.8(b). Specifically, under subsection (b) of the Mayor Provision, the Mayor is
a conservator of the peace, and in emergencies may exercise within the City the powers conferred by the Governor of the State of Colorado for purposes of military law, and shall have the authority to command the assistance of all able-bodied citizens to aid in the enforcement of the ordinances of the City and to suppress riot and disorder.
Id.
¶29 The Mayor also has the exclusive power to appoint eligible persons to serve, on a temporary basis, as municipal court judges when all regularly appointed municipal court judges are absent, disqualified, or unable to act in a matter or case and the presiding judge is also absent. Id. at § 6.2. And the Mayor appoints one member of the Thornton Active Adult Board. City of Thornton, Colo., Mun. Code, ch. 2, art. III, § 2-85(b)(1).
¶30 The Charter and the Code make clear that the Mayor can exercise each of the foregoing powers unilaterally, separate from the City Council, and without the involvement or consent of any of the eight Ward Councilmembers. No such powers or responsibilities are delegated to any individual Ward Councilmember.
¶31 The Charter also repeatedly refers separately to the "office of Mayor" and the "office of Councilmember." When the Charter addresses only the Mayor, it refers to that position as "the office of Mayor." See, e.g., City of Thornton, Colo., Charter, §§ 4.4, 4.5(a). When the Charter and the Code address only the Ward Councilmembers, they state "the office of Councilmember" or "office of the Councilmembers." See, e.g., id. at §§ 4.3, 4.4, 4.5(b); City of Thornton, Colo., Mun. Code, ch. 2, art. VI, § 2-244. In contrast, neither the Charter nor the Code refers to the City Council as "the office of City Council." Rather, when the Charter addresses the City Council collectively as a legislative body, it does so expressly by referring to it as "the Council." See, e.g., City of Thornton, Colo., Charter, §§ 3.2, 3.3, 4.1, 4.2, 4.5(b), 4.6, 4.15, 4.16.
¶32 And throughout the Charter and Code, when outlining limits and requirements that apply to both the individual elected to serve as Mayor and the individuals elected to serve as Ward Councilmembers, the drafters chose to address them separately with the disjunctive "or." For example, the Charter establishes the age and citizenship requirements for an individual to be eligible to be elected to "the office of Mayor or Councilmember" and goes on to state, "No person shall serve as Mayor or Councilmember while also holding another elected position in government." Id. at § 4.4 (emphases added). Similarly, the Code provides, "Before a candidate for councilmember, or mayor, is eligible for office," the candidate must certify that they meet the applicable residency requirements for office. City of Thornton, Colo., Mun. Code, ch. 2, art. VI, § 2-243(a) (emphasis added). ¶33 As we have long recognized, the use of the word "or" in this fashion ordinarily demarcates different categories. People v. Valenzuela, 216 P.3d 588, 592 (Colo. 2009). Moreover, as noted above, in interpreting a municipality's enactments, we must give effect to the words used, respecting the drafters' choice of language and declining to add or subtract words. See UMB Bank, ¶ 22, 408 P.3d at 840. Doing so here compels us to conclude that Thornton's Charter and Code create separate and distinct offices of Mayor, on the one hand, and Ward Councilmember, on the other. Concluding otherwise would require us to ignore the myriad distinctions set forth above, which we may not do. See Elder, ¶ 18, 477 P.3d at 698.
¶34 Our conclusion that the offices of Thornton Mayor and of Ward Councilmember are separate and distinct is fully consistent with section 11's above-noted dual purposes.
¶35 As set forth above, section 11's first purpose is "to broaden the opportunities for public service." Colo. Const. art. XVIII, § 11 (1). Here, it appears undisputed that section 11 does not place a cumulative limit on consecutive service in different local government offices. It only prohibits nonjudicial elected officials from serving more than two consecutive terms in the same office. Id. In this way, section 11 mirrors article IV, section 1(2) of the Colorado Constitution, which, for the same purpose as section 11, sets term limits on those serving as Governor, Lieutenant Governor, Secretary of State, State Treasurer, and Attorney General. No one appears to dispute that a person could serve two consecutive terms in each of those state offices, even if a person served in each office successively. For the same reasons, we see no violation of section 11's intent in allowing a person to serve consecutive terms as Mayor and as Ward Councilmember, which we have concluded are separate and distinct offices under the Charter.
¶36 Section 11's second stated purpose is to "assure that elected officials of governments are responsive to the citizens of those governments." Colo. Const. art. XVIII, § 11 (1). Salazar does not argue that our interpretation thwarts this purpose. Indeed, when a former Ward Councilmember runs for Mayor, they must appeal to all four quarters of the populace, rather than just one of the four wards, to succeed in the election. This new population of voters includes a majority of voters that the former Ward Councilmember has not previously represented. And in our view, requiring a former Ward Councilmember and new mayoral candidate to appeal to a larger and distinct electorate promotes responsiveness to Thornton voters as a whole.
¶37 In concluding that Thornton's Mayor and Ward Councilmembers serve in separate and distinct offices for purposes of section 11's term limit provisions, we are unpersuaded by Salazar's various arguments to the contrary.
¶38 Salazar contends that Thornton's Mayor is "functionally nothing more than a first among equals on Council" and that any distinction between the Thornton Mayor and Councilmembers are almost all "ceremonial or procedural" and "very minor" in comparison with the "substantive powers" that the Mayor shares with the Councilmembers. If Salazar were correct, however, then many of the above-described Charter and Code provisions would be superfluous. For example, there would be no need for the Charter to require different provisions for the elections of the Mayor and of Ward Councilmembers or for the filling of vacancies in those positions. See City of Thornton, Colo., Charter, §§ 4.3, 4.5. Nor would there be a need for the Charter and the Code to refer to the respective positions separately (and in the disjunctive) as "the office of Mayor" and "the office of Councilmembers." See id. at §§ 4.3-4.5; City of Thornton, Colo., Mun. Code, ch. 2, art. VI, §§ 2-243(a), 2-244. It would likewise be unnecessary for the Charter to provide that the Mayor has the same right to speak and vote at City Council meetings as the Ward Councilmembers. City of Thornton, Colo., Charter, § 4.8(a). And if the offices of Mayor and of Ward Councilmember are truly the same, then there would be no basis for paying the Mayor $6,000 more per year than Ward Councilmembers, as the Code prescribes. See City of Thornton, Colo., Mun. Code, ch. 2, art. II, div. 1, § 2-26. In short, because Salazar's interpretation would render entire sections of the Charter superfluous, we cannot adopt that interpretation. See Elder, ¶ 18, 477 P.3d at 698.
¶39 Salazar also argues that our interpretation means that each Ward Councilmember occupies a different office from every other Ward Councilmember and therefore every Ward Councilmember could serve an unlimited number of terms on the City Council, as long as they change their residency and obtain election to a new ward seat every two terms. No one disputes, however, that the eight Ward Councilmembers all hold the same office for section 11 purposes, and nothing in this opinion can reasonably be read to suggest otherwise. Rather, we distinguish only the office of Mayor, on the one hand, from the office of Ward Councilmember, on the other.
¶40 Finally, we are unpersuaded by Salazar's reliance on the Nevada Supreme Court's decision in Lorton, 322 P.3d at 1052-59, and on Colorado Attorney General Opinion No. 00-5, Colo. Op. Att'y Gen. No. 00-5 (July 10, 2000), both of which Salazar claims are directly on point.
¶41 As noted above, in Lorton, 322 P.3d at 1052-53, the court considered a state constitutional provision declaring that "[n]o person may be elected to any state office or local governing body who has served in that office, or at the expiration of his [or her] current term if he [or she] is so serving will have served, 12 years or more." (Quoting Nev. Const. art. XV, § 3 (2); alterations in original.) The question presented was whether, when a local governing body includes multiple positions (there, when the city council was comprised of both city council members and the city's mayor), the above-quoted constitutional provision precluded a person who had served in one position on that local body from then serving additional terms in a different position on that same body. Id. at 1053. To decide this, the court had to determine whether, in that city, the mayor's position was sufficiently distinct from that of the city council members to preclude application of the constitutional term limit to council members who wished to run for mayor. Id. at 1058. Relying on the specific provisions of the applicable city charter, the court concluded that it was not and that the mayor and the council members were members of the same "local governing body." Id. at 1058-59. Thus, because the state constitution precluded a person who had served in one position on a "local governing body" from serving additional terms in a different position on that body, term-limited council members were ineligible to be elected mayor. Id. at 1059.
¶42 Lorton, however, is distinguishable because in concluding that the mayor and city council members were not sufficiently distinct to preclude application of the Nevada term limit provision, the Lorton court relied on the specific language of the applicable city charter. Id. at 1058-59. Although that language may well be similar in some respects to that in Thornton's Charter, the language of the charter at issue in Lorton is not identical to the language at issue here, and the specific language of Thornton's Charter and Code controls our analysis. ¶43 As for Attorney General Opinion No. 00-5, we note, as an initial matter, that Attorney General Opinions, though entitled to "respectful consideration," are not binding on us. Colo. Common Cause v. Meyer, 758 P.2d 153, 159 (Colo. 1988) ; Justus v. State, 2014 CO 75, ¶ 31 n.11, 336 P.3d 202, 211 n.11. In any event, on its face, that opinion did not address the specific question presented before us. Rather, it considered whether (1) a term-limited elected official from one district may run for election to the same body from a different district; (2) if redistricting creates a new or reconfigured district, whether a term-limited elected official may run for election to the same body from the new or reconfigured district; and (3) a term-limited official serving in an at-large seat in an elected body may run for election to a specific seat in that same body. Colo. Op. Att'y Gen. No. 00-5, at 1-2. The Attorney General answered "no" to each of these questions, id., which we perceive to be analogous to the question of whether a term-limited Ward Councilmember in Thornton can move to a different ward and immediately run for election as a Ward Councilmember from that ward. Consistent with the Attorney General's opinion, no one here appears to dispute that this would be impermissible.
¶44 In reaching our conclusion that the offices of Mayor and of Ward Councilmember constitute separate and distinct offices for purposes of section 11's term limit provisions, we acknowledge the view of some that a person should not, as a matter of good policy, be permitted to serve two terms as a Ward Councilmember and then two terms as Mayor in Thornton. For the reasons discussed at length above, however, we believe that the plain language of Thornton's Charter and Code compels this result. If the City Council or the voters intended otherwise, then they are free to amend their Charter or Code so that the operative language effectuates their intent. We, however, will not impose such amendments by judicial fiat. See People v. Weeks, 2021 CO 75, ¶ 38, 498 P.3d 142, 154.
III. Conclusion
¶45 For these reasons, we conclude that under the plain and unambiguous terms of both the Thornton Charter and Code, the offices of Mayor and of Ward Councilmember in the City of Thornton constitute separate and distinct offices for purposes of section 11's term limitations. Accordingly, on the undisputed facts before us, we further conclude that Kulmann will soon complete her first term as Thornton Mayor, and, consistent with section 11, she may seek one more consecutive term in that office.
¶46 We therefore reverse the judgment of the district court as to its conclusion that the offices of Mayor and of Councilmember are one and the same for purposes of section 11, and we need not reach the second issue on which we granted certiorari.
JUSTICE HOOD, joined by JUSTICE BERKENKOTTER, dissented.
JUSTICE HOOD, joined by JUSTICE BERKENKOTTER, dissenting.
¶47 Colorado's many municipalities (and other political subdivisions) have their own charters, structures, and procedures, vesting their elected officials with diverse powers and responsibilities. But article XVIII, section 11 of the Colorado Constitution ("section 11") sets a statewide requirement: no person may serve more than two consecutive terms "in office" unless their constituents vote otherwise. No such vote occurred here.
¶48 Instead, the majority eliminates the need. It simply applies the word "office" to the mayoral seat on the Thornton City Council, rather than applying it to the governmental body of which that seat is a part. Because I believe that this conclusion runs afoul of longstanding, voter-approved term limits in the case at bar and threatens to breed confusion in the multitude of cases potentially yet to come, I respectfully dissent.
I. The Definition of "In Office"
¶49 Section 11 provides that "no nonjudicial elected official of any ... city ... shall serve more than two consecutive terms in office." Colo. Const. art. XVIII, § 11 (1). The majority concludes that "in office" refers to a specific position held by a nonjudicial elected official (rather than to a larger governing body) "plainly and unambiguously." Maj. op. ¶ 21. As the majority also observes, however, a provision is ambiguous when it is reasonably susceptible of multiple interpretations. Id.; see Elder v. Williams, 2020 CO 88, ¶ 18, 477 P.3d 694, 698. And here, as the district court concluded and petitioner acknowledges, service "in office" could be reasonably interpreted to mean serving on a local governmental body.
¶50 After all, the state constitution doesn't define the term, and dictionaries point to both interpretations. For example, Merriam-Webster defines "office" as both "a special duty, charge, or position conferred by an exercise of governmental authority and for a public purpose," which would support the majority's "specific office" interpretation, and as "a major administrative unit in some governments," which would support respondent's governing body interpretation. See, e.g., Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/ office [https://perma.cc/HV74-RHUT].
¶51 A quick comparison to other term-limit provisions is also instructive. In Colorado, the legislative term-limit provision restricts service within the "senate" or "house of representatives," Colo. Const. art. V, § 3 (2), and the statewide term-limit provision for the governor and other executive-branch offices bars "more than two consecutive terms in such office," Colo. Const. art. IV, § 1 (2) (emphasis added). In contrast, section 11 has no qualifier narrowing its reach to an expressly identified governmental body or a particular seat within that body. So we're left to surmise what constitutes the most plausible reading.
¶52 Because it is reasonably susceptible of more than one interpretation, section 11 is ambiguous. And because it is ambiguous, we must turn to other interpretive aids. Such aids include statements of the voters' overarching intent and the possible consequences of different interpretations. See Elder , ¶ 18, 477 P.3d at 698. To discern the voters' intent, we consider "relevant materials such as the ballot title and submission clause and the biennial ‘Bluebook,’ which is the analysis of ballot proposals prepared by the legislature." Davidson v. Sandstrom, 83 P.3d 648, 655 (Colo. 2004) (quoting In re Submission of Interrogatories on House Bill 99-1325, 979 P.2d 549, 554 (Colo. 1999) ). We strive to "construe the amendment in light of the objective sought to be achieved and the mischief to be avoided," id. at 655 (quoting Zaner v. City of Brighton, 917 P.2d 280, 283 (Colo. 1996) ), and avoid engaging "in a narrow or technical construction of the initiated amendment if doing so would contravene the intent of the electorate," id. at 654.
¶53 In searching for the intent of the electorate here, we needn't look far. Section 11 begins by telling us its purpose: "to broaden the opportunities for public service and to assure that elected officials of governments are responsive to the citizens of those governments." Colo. Const. art. XVIII, § 11 (1). By mandating turnover, section 11 seeks to increase vacancies and, by extension, the availability of public service opportunities for people with fresh perspectives.
¶54 In arguing that its interpretation meets this purpose, the majority spotlights the fact that the mayor must seek support from all wards, not just one. But in the 1994 Bluebook, advocates of section 11 (the people who persuaded a majority of statewide voters) argued that elections alone are insufficient to guarantee responsive elected officials; long-term political entrenchment, they insisted, leaves elected officials unmoored from their constituents. Legis. Council, Colo. Gen. Assemb., An Analysis of 1994 Ballot Proposals 54-58 (1994) ("Bluebook"), https://www.sos.state.co.us/pubs/elections/Results/BlueBooks/1994BlueBook.pdf [https://perma.cc/TPA8-8CLP].
¶55 These sources urge a broader construction of "in office" than the majority offers, and the consequences of its decision further demonstrate why.
¶56 The majority's holding allows an individual to serve as a councilmember in perpetuity. If reelected, Kulmann will serve fourteen years on the City Council by the end of her term (six years longer than the two four-year terms contemplated by section 11 ). By alternating between eight-year stints as a ward-elected and an at-large councilmember/mayor, an individual could hold the same legislative position in the city of Thornton forever. Two residents from the same ward could even swap places between the at-large-mayor and ward-elected-councilmember positions every eight years, foreclosing public-service opportunities for the rest of the city and enabling select residents to serve on the City Council for life. Of course, the officials would still have to win election each time, but one of the chief concerns of section 11 proponents was that incumbents rarely lose reelection. Bluebook, supra ¶ 54, at 52-56.
¶57 Moreover, by concluding that the mayor and the councilmembers serve in distinct offices, the majority shifts section 11's default setting in favor of term limits to a preference against them, in clear opposition to the voters' intent. The majority states that if Thornton voters intend to hold the mayor and city councilmembers to the same term limits, they "are free to amend their Charter or Code so that the operative language effectuates their intent." Maj. op. ¶ 44. This flips section 11's opt-out provision on its head. As written, section 11 imposes term limits that voters may opt out of by voting to "lengthen, shorten or eliminate" them. Colo. Const. art. XVIII, § 11 (2). But the majority's holding requires Thornton voters to opt back in to those constitutionally imposed term limits.
¶58 In addition, even if section 11 treated the mayoral and councilmember positions as distinct when considered in isolation, we should not lose sight of the fact that the mayor of Thornton is also a councilmember for the duration of her term. The Thornton Charter says as much when it establishes that its City Council consists of "nine (9) members, one of whom shall serve as Mayor." City of Thornton, Colo., Charter, § 4.1. Mayor Kulmann has served as a councilmember for more than two terms. Therefore, if "in office" refers to the Council, she loses.
¶59 The majority rejects this interpretation —that the mayor is simply one of the councilmembers— in part because of the word "or" in the Charter's other provisions, such as those detailing the election qualifications for "the office of Mayor or Councilmember," which the majority views as creating mutually exclusive positions. See Maj. op. ¶ 32; City of Thornton, Colo., Charter, § 4.4. However, a disjunctive "or" is not always mutually exclusive. The word can be either inclusive or exclusive depending on how it is used, and while both interpretations can be reasonable, the majority's mutually exclusive interpretation is the rarer usage.1 In fact, People v. Valenzuela, 216 P.3d 588 (Colo. 2009), cited by the majority, makes the point. There, this court confirmed that a statute criminalizing the "unlawful distribution, manufacturing, dispensing, sale, or possession of a controlled substance" constituted a single offense, no matter if the defendant committed just one of those actions or several. Id. at 589-92 (quoting § 18-1.3-401(10)(b), C.R.S. (2008) ). People v. Abiodun, 111 P.3d 462, 468 (Colo. 2005), a case cited in Valenzuela, notes that someone manufacturing a drug must also possess it at some point. Even though the statute criminalizes possession or manufacture, one clearly includes the other. Similarly, in this context, we should interpret the word "or" inclusively because the Charter already confirms that the mayoral position includes a seat on the City Council. City of Thornton, Colo., Charter, § 4.1. Nothing in Thornton's Charter or section 11 indicates that the two positions would constitute mutually exclusive offices.
¶60 The majority's interpretation is also incongruous with other government positions where a single person occupies two offices simultaneously. The speaker of the Colorado House of Representatives has additional responsibilities, but the speaker is still a representative. The chief justice of the Colorado Supreme Court has additional duties, but the chief justice is still a justice. In these situations, a single government official occupies two positions simultaneously. See, e.g., Colo. Const. art. VI, § 5 (dictating that while the chief justice of our court is the "executive head of the judicial system" and appoints the chief judges in each judicial district, the chief justice is still one of not fewer than seven justices constitutionally required).
¶61 The majority's opinion not only yields potentially perverse results in Thornton, it creates a recipe for statewide confusion. I turn to this concern now.
II. Differentiating Offices
¶62 If all of Colorado's nearly 4,000 local governments used the same structure, the majority's interpretation would provide clarity across the state. Instead, Colorado's thousands of local governments are remarkably diverse. While the majority's opinion resolves Thornton's dispute, it leaves far more questions than answers for other political subdivisions.
A. The Majority's Multi-Factor Test
¶63 The majority seems to rely on several considerations to determine what constitutes an "office" for section 11 purposes, essentially conducting a broadly inapplicable and Thornton-specific multi-factor test. As I read it, the majority's seemingly non-exclusive factors are: (1) elections and constituents, Maj. op. ¶ 26; (2) distinct classifications in the governing document, id. at ¶¶ 31-32; (3) differences in powers, id. at ¶¶ 28-30; (4) vacancy procedures, id. at ¶ 27; and (5) disparate salaries, id. at ¶ 38. After analyzing these factors, the majority concludes that Thornton's mayor occupies a distinct office from the other councilmembers. Id. at ¶¶ 34, 38.
¶64 However, the majority doesn't say whether any factors are dispositive, nor does it instruct future courts how to weigh the factors against each other. This court's lack of guidance will create uncertainty in time-sensitive lawsuits, and courts will be forced to undertake complex and subjective fact-specific analyses for local government elections.
¶65 For example, the majority considers it important that the mayor and the ward councilmembers "are elected in different ways and by different constituencies" and that "they represent different groups of people." Maj. op. ¶ 26. So, different voter pools apparently suggest different offices. Under this reasoning, an at-large councilmember and a ward-elected councilmember occupy different offices, and councilmembers can just move between wards to refresh their voter pools and thus their term limits. While the majority reasons that "nothing in this opinion can reasonably be read to suggest" such an outcome is possible, id. at ¶ 39, and "no one here appears to dispute that [running in a different ward to avoid term limits] would be impermissible," id. at ¶ 43, the majority fails to explain why the distinction it recognizes between the mayor and other councilmembers wouldn't apply to councilmembers of different wards.
¶66 Another example of the majority's unpredictable analysis is its argument that the mayor is distinct because she has a higher salary than the councilmembers. Maj. op. ¶ 38. This factor is confusing too, given the rest of the opinion. Earlier, the opinion suggests that a city council president in another city, unlike a mayor, would occupy the same office as other councilmembers. Id. at ¶ 26. However, city council presidents are regularly paid more than other councilmembers. See, e.g., Denver Rev. Mun. Code 18-81 (setting the salary for the president of the Denver City Council more than $10,000 higher than the other councilmembers). It is the same with officials in other parts of the government. For instance, the speaker of the House of Representatives earns more than other representatives in Congress, even though the speaker is still a representative. U.S. House of Representatives, Press Gallery, Salaries (Jan. 2015), https://pressgallery.house.gov/member-data/salaries [https://perma.cc/92DV-PFB7]. At this court, the chief justice earns slightly more than the court's other members but is still a justice. Colo. Jud. Branch, FY2022 Compensation Plan by Class Title (2022), https://www.courts.state.co.us/userfiles/file/Administration/HR/Compensation_and_Benefits/FY22% 20Comp% 20Plan% 20Updated% 2004112022.pdf [https:/ /perma.cc/4WW4-FPE4].
¶67 While the majority's analysis is thorough for Thornton, its factors seem arbitrary when applied to other comparable government structures. I fear that this Thornton-specific analysis may map poorly onto the state's other jurisdictions and destabilize varying municipal structures.
B. Future Questions
¶68 The majority's assortment of factors helps it distinguish the mayor's office from the other councilmembers in Thornton, but it does not say how to draw the line between potentially distinct offices elsewhere. In the future, courts may attempt to apply the majority's Thornton-specific analysis to other local governments with varied structures.
¶69 Two examples illustrate why judges might have difficulty applying the majority's new precedent to other political subdivisions.
¶70 First, consider the many communities where the mayor is elected by the city councilmembers, rather than at large by the voters in the municipality. The majority opinion suggests that in such a case, the mayor is subject to the same term limits as other councilmembers because the mayor is initially elected as a councilmember. Maj. op. ¶ 26. If so, the majority seems to indicate that if Thornton made a single change —for councilmembers to elect the mayor, rather than the city's voters —the mayor would no longer occupy a separate office (despite the other differences the majority listed). If that's the case, is the single determining factor whether a mayor is elected separately? At the very least, the lack of clarity opens the door to more litigation in other pockets of the state. More than half of Colorado municipalities use a council-manager form of government, and nearly a third don't elect the mayor separately. See Legis. Council Staff, Rsch. Publ'n No. 719, 2018 Colorado Local Government Handbook 17 (2018), https://leg.colorado.gov/sites/default/files/2018_local_government_handbook _with_cover_0.pdf [https://perma.cc/DVE6-LDWS]; Int'l City/Cnty. Mgmt. Ass'n, Council-Manager Form of Government (Nov. 30, 2019), https://icma.org/documents/council-manager-form-government-what-it-how-it-works-and-benefits-your-community-brochure [https://perma.cc/3T9J-GXJL].
¶71 Second, consider another local government in which each elected individual has a different title; for example, a county that elects a treasurer, secretary, and a chair that each has a legislative vote on the county commission. Are these separate offices? And, what occurs if the county changes its election procedures so that each of the three county commissioners is elected by district, and they then choose among themselves who carries out each duty? How should a court apply the majority's opinion in a potential term-limit dispute in the county? Without dispositive factors or an explicit balancing test, local governments will not know whether two positions constitute distinct offices, and they will have no way to know if a small change in governing documents would alter term limits.
¶72 The majority finds certain factors relevant in its opinion but does not tell us why they are relevant and how these factors should be weighed and applied. In local government cases, where fact-specific analyses are common, this court should provide a framework for judges to resolve potential cases. Because the majority opinion does not, I fear this court opens the door to politically motivated term-limit litigation in the future. And it will leave not only courts but also municipalities and officeholders to guess what is permissible.
III. Resignations
¶73 Although the majority declined to address the second issue presented (regarding early resignations), I believe local governments would benefit from this court's guidance on the issue. Therefore, I would address it and conclude that Kulmann is term limited now.
¶74 The Colorado Constitution provides a clear answer for both legislative and executive term limits. Colo. Const. art. V, § 3 (2); Colo. Const. art. IV, § 1 (2). In each case, a partial term counts toward the limit if someone serves more than half of a full term. But section 11 says no such thing.
¶75 Further, the Bluebook described the law at the time of the amendment: while the partial-term provision applied to members of Congress, it did not apply to any of section 11's other offices, including those in local government.2 Bluebook, supra ¶ 54, at 53.
¶76 If read plainly, section 11 sets a clear default: consecutive terms count toward the limit, no matter their length. The amendment's only language on the issue says that "[f]or purposes of this Section 11, terms are considered consecutive unless they are at least four years apart." Colo. Const. art. XVIII, § 11 (1). Nowhere does section 11 say that only full terms count toward the term limit. Instead, the amendment says that more than two consecutive terms are prohibited, and consecutive terms are any of those that are less than four years apart. Id. If someone resigns halfway through their term and runs for election again within four years, the term limit is met because the terms are consecutive within the plain meaning of the constitution. ¶77 Because section 11 plainly counts all consecutive terms toward the term limit, no matter their length, I would hold that Kulmann's second consecutive term concluded when she resigned from the Council.
¶78 Kulmann proposes an unworkable "legitimate reason" test to determine when a partial term is exempted from term limits. She argues that since other provisions address partial terms, the absence of such language in section 11 implies that voters intended not to count partial terms toward the limit. As a result, Kulmann believes section 11 sets the opposite default: partial terms don't count unless someone takes advantage of them maliciously. Kulmann contends that a "term" refers to a fixed and definite time — the full four years scheduled for an office between reelection — rather than the number of times an individual has served in elected office.
¶79 The mayor's recommendation presents at least a couple of obvious problems. First and foremost, the proposed test is completely untethered from the language of the amendment, the voters' intent, or any implementing statutes. Second, the test would force courts to adjudicate messy cases where a public official's veracity and legitimacy are questioned. A subjective "legitimacy" test would put judges into the uncomfortable position of making ad hoc personal judgments. Is a divorce a legitimate reason to resign? How about the death of a loved one? Adopting Kulmann's test would open a pandora's box of term-limit loopholes, inviting anyone to sidestep section 11 if they are able to orchestrate a "legitimate" reason to resign and persuade a judge of the same.
¶80 Therefore, I would reach the second issue, reverse the district court's order, and conclude that under the plain language of the Colorado Constitution, a partially served term counts toward the term limits.
¶81 For all the foregoing reasons, I respectfully dissent.
1 Specifically, we granted certiorari, pursuant to C.A.R. 50(a), to decide:
1. Whether the Office of Mayor is sufficiently distinct from the Office of Councilmember in the City of Thornton such that a term of office for one cannot be used as a term of office for the other in calculating Section 11's two-term restriction.
2. Whether an elected official who only serves a partial term of office for legitimate reasons counts towards the calculation of Section 11's two-term restriction.
1 Kenneth A. Adams & Alan S. Kaye, Revisiting the Ambiguity of "And" and "Or" in Legal Drafting , 80 St. John's L. Rev. 1167, 1180-83 (2006) ("[A]uthorities on legal drafting have stated that or is ambiguous, in that it can be ‘inclusive,’ meaning A or B, or both, or it can be ‘exclusive,’ meaning A or B, but not both."). And, courts recognize that the word "or" is usually used in legal drafting in an inclusive manner, meaning that the majority's interpretation of "or" here as mutually exclusive is less common. See Encino Motorcars, LLC v. Navarro, ––– U.S. ––––, 138 S. Ct. 1134, 1141-42, 200 L.Ed.2d 433 (2018) ; In re Estate of Dodge, 685 P.2d 260, 266, 266 n.1 (Colo. App. 1984) (concluding that "or," as used in the relevant statute, was "to be given its usual inclusive construction" because "it simply ‘is not usual to interpret the "or" in an alternative proposition as expressing the exclusion of one alternative’ ") (quoting L. Susan Stebbing, A Modern Introduction to Logic 70-71 (6th ed. 1948)). "That is, ‘or’ is consistent with ‘perhaps both’; ... the onus probandi lies on those who assert [that] the logical interpretation of ‘or’ should be exclusive." Estate of Dodge, 685 P.2d at 266 n.1 (quoting Stebbing, supra ¶ 59 n.1, at 70-71).
2 The Supreme Court later struck down Colorado's congressional term-limit provision, holding it unconstitutional for states to set federal term limits stricter than the U.S. Constitution because states do not have authority "to change, add to, or diminish" the requirements for Congress enumerated in the Qualifications Clause. U.S. Term Limits, Inc. v. Thornton, 514 U.S. 779, 785, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995) (quoting U.S. Term Limits, Inc. v. Hill, 316 Ark. 251, 872 S.W.2d 349, 356 (Ark. 1994) (plurality opinion)).