2013 COA 9

**ALPENHOF, LLC, a Colorado limited liability company, Plaintiff–Appellant,**

v.

**The CITY OF OURAY, a Colorado home rule city, Defendant–Appellee.**

**No. 12CA0500.**

Colorado Court of Appeals, Div. I.

Jan. 17, 2013.

The Tisdel Law Firm, P.C., Michael D. Hockersmith, Andrew A. Mueller, Ouray, Colorado, for Plaintiff–Appellant.

The Masters Law Firm, P.C., David L. Masters, Kathryn M. Sellars, Montrose, Colorado, for Defendant–Appellee.

Opinion by Judge WEBB.

¶ 1 Plaintiff, Alpenhof, LLC, raises an unresolved question in Colorado: whether flooding risk from a diverted natural waterway channel involves either a "geologic condition" or a "natural hazard" within the meaning of a zoning code. Defendant, City of Ouray, denied Alpenhof's subdivision application, finding that flooding risk from a diverted creek required mitigation, for which the application did not provide. The district court rejected Alpenhof's C.R.C.P. 106(a)(4)

challenge to this denial. Alpenhof now appeals.

¶2 We conclude that the city properly denied Alpenhof's application. The flooding risk to the property identified by the city potentially endangers public health, safety, and welfare. This risk remains intertwined with both the geologic features of the area and natural events, although the water would overflow from a diversionary structure built by the city. Therefore, we affirm.

## I. Background

¶3 According to a site reconnaissance report in the record, the Skyrocket Creek basin "is characterized by steep slopes averaging approximately 80% [in grade]," descending from an elevation of 10,400 feet to the city approximately 2,800 feet below. In 1929, to protect against historically severe flooding from cloudbursts and rapid spring runoff, the city diverted the creek. It had previously drained south of what is now Alpenhof's property, and since the diversion has flowed north of this property. While various improvements have been made through the years, the city's basic diversionary plan remains unchanged.

¶4 In 1997, the city approved subdivision of most of the property, then owned by a predecessor in title, as the Ouray Vista Subdivision ("subdivision"). The subdivision is located in the alluvial fan of the creek.[1] Parcel C of the subdivision, adjacent to the north diversionary channel, was not subdivided at that time. However, the plat marked Parcel C for "future possible development" and contained a note saying that the parcel "may not be developed in any fashion until further approval" from the city.

¶5 In January 2011, Alpenhof submitted the preliminary plat application at issue to subdivide Parcel C. The Ouray Planning Commission reviewed the application and conditionally approved it, provided that Alpenhof would mitigate potential damage from future floodwater and debris.[2] The conditional approval was forwarded to the Ouray City Council for final action.

¶6 Alpenhof requested that the city council approve the plat without the mitigation requirements imposed by the planning commission. After a hearing, the city council determined that mitigation could be required under section 7–7–D–10 of the Ouray City Code ("code"),[3] titled "Natural Hazard Mitigation," and the "broad discretion" granted by the note on the original plat. It found that, as presented, Alpenhof's plan did not sufficiently mitigate the "geologic conditions" and "natural hazards" threatening Parcel C. For these reasons, Alpenhof's application was denied.

¶7 Alpenhof petitioned the district court for relief under C.R.C.P. 106(a)(4). It asserted that the city had exceeded its jurisdiction and abused its discretion in denying the application. Alpenhof argued that, because flooding would result from the city's diversion channel and other structures, such risk could not be considered either a "geologic condition" or "natural hazard" subject to mitigation under section 7–7–D–10. Alpenhof also argued that no record evidence supported the city council's decision, and that the note on the original plat does not grant the city regulatory authority beyond section 7–7–D–10. Alternatively, Alpenhof sought an award for inverse condemnation.

---

1. While most of the creek drained south of the property, over time the creek has wandered across the valley, creating a cone-shaped alluvial fan by depositing sediment and debris during significant flood events.

2. The planning commission required: armoring and maintaining the berm adjacent to Parcel C, using a design approved by the city; submitting the property to a "future special improvement district" to build a culvert; demonstrating inclusion of and conformity with all plat notes; and addressing additional concerns previously raised by commission staff and the city engineer.

3. "Where geologic conditions and/or natural hazards are identified in the Engineering Geology Report that could adversely affect the development, the developer must take the steps necessary to mitigate the hazards, in accord with recommendations made by a registered engineer or qualified geologist. The City, its officers and employees, will be held harmless for damages or injuries to persons or property resulting from failure or inadequacy of mitigation measures. A release on forms approved by the City shall be included in a plat note." Section 7–7–D–10.

¶ 8 The district court denied Alpenhof's C.R.C.P. 106(a)(4) claim, certified its order under C.R.C.P. 54(b), and stayed proceedings on Alpenhof's inverse condemnation claim.

## II. Standard of Review

¶ 9 "Review of a governmental body's decision pursuant to [C.R.C.P.] 106(a)(4) requires an appellate court to review the decision of the governmental body itself rather than the district court's determination regarding the governmental body's decision." *Board of County Commis. v. O'Dell*, 920 P.2d 48, 50 (Colo.1996). In doing so, an appellate court applies the same standard of review to decisions of a governmental entity as would a district court. *Prairie Dog Advocates v. City of Lakewood*, 20 P.3d 1203, 1206 (Colo.App.2000). When reviewing a C.R.C.P. 106(a)(4) claim, a court must affirm unless the governmental entity abused its discretion or exceeded its jurisdiction. *Id.* Such an entity exceeds its jurisdiction or abuses its discretion only if it either misapplies the law or no competent record evidence supports its decision. *Bd. of County Comm'rs v. Conder*, 927 P.2d 1339, 1343 (Colo.1996).

¶ 10 Interpretation of a city code is reviewed de novo, applying ordinary rules of statutory construction. *Leggett & Platt, Inc. v. Ostrom*, 251 P.3d 1135, 1140 (Colo.App. 2010). However, appellate review extends only to those code provisions included in the record. *See City of Pueblo v. Murphy*, 189 Colo. 559, 561, 542 P.2d 1288, 1289 (1975) ("[C]ourts of general jurisdiction may not take judicial notice of the ordinances of municipal corporations in civil or criminal cases. Similarly, in reviewing appellate issues, we have also declined to take judicial notice of municipal ordinances.") (internal citations omitted). And interpretations by the governmental entity charged with administering a code deserve deference, provided they are consistent with the drafters' overall intent. *Waste Mgmt. of Colorado, Inc. v. City of Commerce City*, 250 P.3d 722, 725 (Colo.App. 2010).

## III. Discussion

### A. The City Council Correctly Interpreted Section 7–7–D–10

¶ 11 Section 7–7–D–10 requires developers to mitigate hazards when "geologic conditions and/or natural hazards are identified in the Engineering Geology Report that could adversely affect the development." Alpenhof agrees that this section governs risks to Parcel C resulting from "the natural flow of Skyrocket Creek." Yet, it argues that because the city's diversion channel altered the flow of the creek, the current erosion and flood risk to Parcel C cannot be considered "natural" under section 7–7–D–10.

¶ 12 The city did not cause the creek's rapid descent from its headwaters or the debris arising from the resulting erosion. These features reflect the area's "geologic conditions." *See* § 24–65.1–103(8)(a), C.R.S. 2012 (including "landslides, rock falls, [and] mudflows" as examples of "geologic conditions"). Thus, the hazard to Parcel C is necessarily intertwined with the natural features and geologic conditions of the area.

¶ 13 Neither party included in the record before the city council code provisions addressing whether erosion and flood are "natural hazards." [4] However, the word "flood" does not distinguish between overflows of man-made structures and overflows of natural waterways. *See Kane v. Royal Ins. Co. of Am.*, 768 P.2d 678, 681 (Colo.1989) (holding that an "inundation of water" resulting from a failed dam is still a "flood," even though

---

4. While the code was attached to the answer brief before the district court, we may not accept references in briefs as evidence of the code's text, *Rinn v. City of Boulder*, 131 Colo. 243, 245, 280 P.2d 1111, 1112 (1955), nor may we take judicial notice of municipal codes. *City of Pueblo v. Murphy*, 189 Colo. 559, 561, 542 P.2d 1288, 1289 (1975). Thus, we review section 7–7–D–10 without reference to other sections of the code. We further decline to order sua sponte supplementation of the record, as it is unclear whether the city council relied on additional provisions of the code when denying Alpenhof's claim. *Compare Concrete Contractors, Inc. v. City of Arvada*, 621 P.2d 320, 321 (Colo.1981) (holding that the Court of Appeals abused its discretion by not ordering sua sponte supplementation of the record when it was "apparent from reading the record in this case that the district court considered the provisions of … the municipal ordinance"), *with Novak v. Craven*, 195 P.3d 1115, 1119 (Colo.App. 2008) ("[I]t was incumbent upon [plaintiff] to introduce into evidence a copy of [the code] section.").

caused by the failure of a man-made structure); *Bartlett v. Cont'l Divide Ins. Co.*, 697 P.2d 412, 413 (Colo.App.1984) (holding that damage caused by a failure of a dam "falls well within the ordinary use of the term ['flood']"), *aff'd*, 730 P.2d 308 (Colo.1986); *cf.* Water Conservation Bd. Rules for Regulatory Floodplains Definitions, 2 Colo.Code Regs. § 408–1:4 (2012) (defining "flood" and "flooding" as "[a] general and temporary condition of partial or complete inundation of normally dry land areas from . . . [t]he overflow of water from channels *and reservoir spillways*") (emphasis added).

¶ 14 Further, Alpenhof's narrow interpretation of section 7–7–D–10 runs afoul of the "broad authority [granted] to local governments to plan for and regulate the use of land within their respective jurisdictions." *Colorado State Bd. of Land Commis. v. Colorado Mined Land Reclamation Bd.*, 809 P.2d 974, 983 (Colo.1991) (quoting § 29–20–102, C.R.S.2012); *accord Colorado Manufactured Hous. Ass'n v. Bd. of County Commis.*, 946 F.Supp. 1539, 1554 (D.Colo.1996) ("It is well-settled that [m]unicipalities may zone land to pursue any number of legitimate objectives related to the health, safety, morals, or general welfare of the community. The police power of a municipality is very broad and the objectives of zoning ordinances can be many and varied.") (internal citations omitted). Thus, zoning ordinances generally represent "valid exercises of the police power to regulate public health, safety, and welfare." *City of Colorado Springs v. Securcare Self Storage, Inc.*, 10 P.3d 1244, 1254 (Colo.2000); *see* § 31–23–303(1) C.R.S.2012 ("Such [zoning] regulations shall be made in accordance with a comprehensive plan and designed to . . . secure safety from fire, panic, floodwaters, and other dangers; to promote health and general welfare."); *General Ins. Co. of America v. City of Colorado Springs*, 638 P.2d 752, 757 (Colo.1981) ("The reason for requiring the subdivider to install street improvements is directly related to the public health, safety and welfare.").

¶ 15 Here, the city council made specific findings about the public safety risks associated with building on Parcel C: that the property "is identified as a hazard area . . .

and is adjacent to areas that have been subject to significant events within the past twenty years," and that multiple reports "describe hazards that could adversely affect the development." These risks to public health, safety, and welfare—possible loss of life and potentially serious property damage from floodwater and debris—are the same, although the risk to Parcel C arises primarily from overflow of the city's diversion channel rather than from overflow of the creek's original channel. Hence, the city rightly concluded that section 7–7–D–10 allows subdivision approval to be conditioned on mitigation of these risks.

¶ 16 In contrast, Alpenhof's interpretation would leave the city powerless to protect the public health, safety, and welfare from a flooding hazard partially resulting from human activity. This would be an absurd result. *See Colorado Water Conservation Bd. v. Upper Gunnison River Water Conservancy Dist.*, 109 P.3d 585, 593 (Colo.2005) (quoting *Frazier v. People*, 90 P.3d 807, 811 (Colo. 2004)) ("[A] statutory interpretation leading to an illogical or absurd result will not be followed."); *Eugene Cervi & Co. v. Russell*, 31 Colo.App. 525, 529, 506 P.2d 748, 750 (1972) ("Statutes must be construed to carry out their beneficent purposes, and not to defeat them."), *aff'd*, 184 Colo. 282, 519 P.2d 1189 (1974).

¶ 17 Additionally, the flooding hazard to Parcel C arises from exceptional rainfall and unusually rapid spring runoff. These are "natural hazards" in a mountain environment, which the city does not cause. *See* § 24–65.1–103(13), C.R.S.2012 (including "flood" in the definition of "natural hazard"); *see also Sher v. Lafayette Ins. Co.*, 988 So.2d 186, 195 (La.2008) ("The flood[ing in New Orleans after Hurricane Katrina] was caused by Hurricane Katrina, *not* by man. The levees did not *cause* the flood, they, whether through faulty design, faulty construction, or some other reason, failed to *prevent* the flood.") (emphasis in original).

¶ 18 For these reasons, we agree that "natural hazard" and "geologic condition," as used in section 7–7–D–10, include the threats of flooding and mud flows found by the city council.[5] Therefore, we defer to the city

**5.** We express no opinion whether section 7–7–D– 10 would apply to flooding that lacked any natu-

council's interpretation of section 7–7–D–10 of the code to require mitigation.

**B.   The Record Supports the City's Actions**

¶ 19 The following evidence in the record supports the city council's conclusion that Parcel C was threatened by flooding and mud flow, which required mitigation:

- Photographs of damage to the area surrounding Parcel C after floods in 2005 and 2010;

- A memorandum from an engineer hired by the city, who analyzed Alpenhof's submittal documents, concluding that "[t]he idea of developing Parcel C without any form of mitigation could greatly endanger those who choose to build on the lots and to live there";

- A map published by the Colorado Geological Survey showing that the entire alluvial fan of the creek is a "high" or "very high hazard zone," which Alpenhof acknowledges;

- A memorandum from the city's land use coordinator explaining that current flood prevention techniques "will not effectively protect Parcel C";

- A 2005 report prepared for the city estimating that a "100–year mudflow [event] would significantly inundate Parcel C" and further concluding that "[g]iven the uncertainty in the available sediment supply, and the sediment volumes estimated in this report, removing the note from the [Parcel C] Plat would not be advisable at this time";

- A memorandum from the city attorney noting that "Skyrocket Creek has also flowed in part down the north channel, even without a diversion structure in place."

Thus, the record is not "so devoid of evidentiary support that it can only be explained as an arbitrary and capricious exercise of authority." *Ross v. Fire & Police Pension Ass'n,* 713 P.2d 1304, 1309 (Colo.1986).

¶ 20 Nevertheless, Alpenhof argues that the city's actions were arbitrary because the record contains evidence supporting Alpenhof's position and thus contradicting some of the above-cited evidence. However, an

appellate court's role "is not and should not be to sit as a zoning board of appeals." *Sundance Hills Homeowners Ass'n v. Bd. of County Commis.,* 188 Colo. 321, 328, 534 P.2d 1212, 1216 (1975); *see O'Dell,* 920 P.2d at 51 (holding that an appellate court may not reweigh evidence, but must accept the relative weights given to conflicting evidence by the governmental entity).

¶ 21 Therefore, we may not disturb the city's action.

**C.   The Plat Note Is Not Necessary to Uphold the City's Action**

¶ 22 Alpenhof argues that the plat note does not grant broader powers to the city but "merely puts Parcel C in the same situation as any other property in the City of Ouray." Because we have concluded that section 7–7–D–10 empowered the city to deny Alpenhof's application for lack of flood mitigation, deciding whether the plat note granted the city additional authority is unnecessary. *See Francis v. City & County of Denver,* 160 Colo. 440, 446, 418 P.2d 45, 48 (1966) (declining to address a zoning issue raised on appeal when "there is a difference of opinion and it is unnecessary to decide that issue in disposing of this case").

**IV.   Conclusion**

¶ 23 The order is affirmed.

Judge TAUBMAN and Judge LOEB concur.

---

ral element or geologic condition, such as failure

of a water tower or pipeline.