The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
March 20, 2025

**2025COA32**

**No. 23CA1909, *Martinez v. Cast, LLC* — Landlords and Tenants — Colorado Premises Liability Act — Actions Against Landlords — International Fire Code**

A division of the court of appeals considers which version of a local fire safety ordinance applies in this premises liability case arising from a fire at a leased dwelling. The division concludes that, under the facts of this case, the applicable ordinance was the one in effect at the time the plaintiff children were injured, not the one in effect at the time the dwelling was built or the lease was executed. The division also concludes that, under section 1103.8.1 of the 2012 edition of the International Fire Code — the edition incorporated into the applicable ordinance — landowners are not required to comply with the smoke alarm requirements specified in the 2012 International Fire Code so long as (1) a building code was in effect at the time of construction; (2) such code required smoke

alarms; and (3) smoke alarms complying with those requirements were already provided in the dwelling.

The division concludes that the trial court erred by instructing the jury on an earlier version of the ordinance than the one in effect at the time the children were injured. Accordingly, it reverses the judgment entered in favor of the children and remands the case to the trial court. In addition, the division addresses one of the defendants' other arguments, which is likely to recur in the event of a retrial, and it declines the children's request for an award of attorney fees.

COLORADO COURT OF APPEALS **2025COA32**

Court of Appeals No. 23CA1909
La Plata County District Court No. 18CV30085
Honorable Kim S. Shropshire, Judge

Anthony Martinez, as father and next friend of Rivers Picasso Martinez, a minor, and Ira Picasso Martinez, a minor,

Plaintiffs-Appellees,

v.

Cast, LLC, a Colorado limited liability company; Caroni Adams, Inc., a Colorado corporation, d/b/a The Property Manager; and Carolyn Caroni Adams,

Defendants-Appellants.

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division VII
Opinion by JUDGE LIPINSKY
Johnson and Moultrie, JJ., concur

Announced March 20, 2025

Scott R. Larson, P.C., Scott R. Larson, Broomfield, Colorado; Recht Kornfeld, P.C., Heather R. Hanneman, Denver, Colorado, for Plaintiffs-Appellees

Sparks Willson, P.C., Jessica L. Kyle, Colorado Springs, Colorado, for Defendant-Appellant Cast, LLC

Lewis Roca Rothgerber Christie LLP, Kendra N. Beckwith, Denver, Colorado, for Defendant-Appellant Caroni Adams, Inc.

Campbell, Wagner & Frazier, LLC, Colin C. Campbell, Greenwood Village, Colorado, for Defendant-Appellant Carolyn Caroni Adams

¶ 1     The Colorado Premises Liability Act (the Act), § 13-21-115, C.R.S. 2024, provides the sole remedy against landowners for injuries on their property.  *Wycoff v. Grace Cmty. Church of Assemblies of God*, 251 P.3d 1260, 1265 (Colo. App. 2010).  The Act divides those persons to whom a landowner owes a duty of care into three categories — trespassers, invitees, and licensees. § 13-21-115(4).

¶ 2     Landowners owe different duties to each category of persons. A person "who enters or remains on the land of another" for the person's "own convenience or to advance the [person's] own interests, pursuant to the landowner's permission or consent," is a "licensee" under the Act.  § 13-21-115(7)(c).  "[S]ocial guest[s]" are licensees.  *Id.*

¶ 3     As relevant to this case, "[a] licensee may only recover damages caused . . . [b]y the landowner's unreasonable failure to exercise reasonable care with respect to dangers created by the landowner that the landowner actually knew about." § 13-21-115(4)(b)(I).  A landowner may be held liable to a licensee who was injured on the landowner's property as a consequence of the landowner's failure to comply with a local ordinance.  *See*

1

*Lombard v. Colo. Outdoor Educ. Ctr., Inc.*, 187 P.3d 565, 575 (Colo. 2008). In such cases, determining whether the landowner breached a duty of reasonable care to the injured licensee may hinge on which version of the ordinance applies. *See id.*

¶ 4    We first consider which version of the local fire safety ordinance applies in this premises liability case arising from a fire at a leased dwelling. The ordinance has been amended at least twice since the dwelling's construction, so the applicable ordinance could be the one in effect at the time of construction, the one in effect at the time the landowner leased the subject premises to the tenant, or the one in effect at the time the subject children were injured. We conclude that, under the facts of this case, the applicable ordinance is the one in effect at the time the children were injured.

¶ 5    Second, we interpret the edition of the International Fire Code (the IFC) embodied in the applicable ordinance. No reported decision in Colorado has interpreted a provision of the IFC, and our interpretation applies to the edition of the IFC in effect in Durango today. We hold that, under section 1103.8.1 of the 2012 edition of the IFC — the applicable edition — landowners are not required to

2

comply with the smoke alarm requirements specified in the 2012 IFC so long as (1) a building code was in effect at the time of construction; (2) such code required smoke alarms; and (3) smoke alarms complying with those requirements were already provided in the dwelling.

¶ 6    Our analysis leads to the conclusion that the trial court erred by instructing the jury on an earlier version of the ordinance than the one in effect at the time the plaintiff children were injured. Accordingly, we reverse the judgment entered in favor of the children and remand the case to the trial court for further proceedings consistent with this opinion.

¶ 7    We also address whether, under the facts of this case, the property manager's authorized agent was a "landowner" for purposes of the Act and review the children's request for attorney fees under section 13-17-102(2), C.R.S. 2024. We decline to consider the other issues presented in this appeal because they are unlikely to arise in the same manner on remand.

## I. Background

### A. Facts

¶ 8    In the early morning hours of June 14, 2017, fire swept through the two-story residential unit at the Tercero Townhomes (the townhomes) in Durango that Hilda Picasso (aunt) leased. At the time of the fire, aunt's sister Grisela Picasso (mother) and mother's minor children Rivers Picasso Martinez and Ira Picasso Martinez (the children) were staying in the unit. Mother and the children were asleep in an upstairs bedroom when mother awoke to heat and smoke. Mother and the children were unable to escape through the bedroom because the flames had reached the bedroom door.

¶ 9    Mother pushed the children out the bedroom window before escaping through it herself. The children sustained physical and psychological injuries as a result of the incident.

¶ 10    Several other individuals were also asleep in the unit when the fire broke out. None of them who testified at trial said they heard a smoke alarm in the unit that night.

## B.    Procedural History

¶ 11    Anthony Martinez (father), in his capacity as the children's father and next friend, sued Cast, LLC, the owner of the townhomes at the time of the fire; Caroni Adams, Inc. (CAI), the townhomes' property manager; and Carolyn Caroni Adams (Ms. Adams), in her capacity as an owner and agent of Cast and CAI (collectively, the Adams parties), under the Act to recover damages for the children's injuries.  The children, through father, alleged that the Adams parties were liable to the children under the Act because the unit "did not have the required number of operational smoke alarms." (We refer to the plaintiffs as "the children," even though father prosecuted this case on their behalf.)

¶ 12    At trial, witnesses presented conflicting testimony on whether the unit had one or two smoke alarms.  The parties did not dispute that one smoke alarm hung on the ceiling in the hallway between the two upstairs bedrooms.  Most of the witnesses said it was the only smoke alarm in the unit.

¶ 13    The children's lawyer presented testimony from a fire safety expert that the upstairs smoke alarm was likely installed in 1979, when the unit was constructed.  The expert said that, at the time of

the fire, the smoke alarm had exceeded its recommended life of ten years by several decades.

¶ 14    After the presentation of evidence, the court instructed the jury that a Durango ordinance in effect at the time of the fire required that "occupancies" such as the unit be furnished with four smoke alarms.

¶ 15    The jury found the Adams parties liable for the children's injuries.  The court entered a judgment in favor of the children, and against the Adams parties, jointly and severally, in the principal amount of $2,483,317.16.

¶ 16    As relevant here, the Adams parties collectively contend that the court provided an incorrect ordinance as evidence of the applicable standard of care.  Ms. Adams and CAI jointly appeal the court's determination that Ms. Adams is a landowner under the Act.

¶ 17    We reverse and remand the case to the trial court because the court instructed the jury on a Durango ordinance that was not germane to determining the landowners' standard of care.  In addition, we conclude that the trial court did not err by finding that Ms. Adams was a "landowner" under the Act and decline the children's request for an award of their attorney fees.

## II. The Act

¶ 18    "The General Assembly enacted the [Act] to 'establish a comprehensive and exclusive specification of the duties landowners owe to those injured on their property.'" *Warembourg v. Excel Elec., Inc.*, 2020 COA 103, ¶ 36, 471 P.3d 1213, 1221 (quoting *Vigil v. Franklin*, 103 P.3d 322, 328 (Colo. 2004)); *see also Wycoff*, 251 P.3d at 1265.

¶ 19    The Act provides, "In any civil action brought against a landowner by a person who alleges injury occurring while on the real property of another and by reason of the condition of such property, or activities conducted or circumstances existing on such property, the landowner is liable only as provided in" section 13-21-115(4).  § 13-21-115(3).  (The Colorado General Assembly amended the Act in 2022.  *See* Ch. 75, sec. 2, § 13-21-115, 2022 Colo. Sess. Laws 383.  In doing so, it renumbered several of the Act's subsections.  Because the amendments did not substantively change the relevant portions of the Act, we cite the current version.)

¶ 20    Section 13-21-115(4) "outlines the respective duties that a landowner owes to trespassers, invitees, and licensees and provides that a breach of those duties may result in liability for damages

caused." *Warembourg,* ¶ 38, 471 P.3d at 1221 (quoting *Lombard,* 187 P.3d at 574). "A landowner owes the greatest duty of care to an invitee, a lesser duty to a licensee, and the least duty to a trespasser." *Id.* at ¶ 39, 471 P.3d at 1221.

¶ 21     As explained above, a "licensee" is "a person who enters or remains on the land of another for the licensee's own convenience or to advance the licensee's own interests, pursuant to the landowner's permission or consent," and social guests are "licensees." § 13-21-115(7)(c). Because the parties do not challenge the court's finding that the children were licensees, we express no opinion on their status for purposes of the Act.

¶ 22     "A licensee may only recover damages caused . . . [b]y the landowner's unreasonable failure to exercise reasonable care with respect to dangers created by the landowner that the landowner actually knew about." § 13-21-115(4)(b)(I). (Our opinion should not be read to mean that evidence of a landowner's failure to exercise reasonable care, without more, is sufficient to prove a claim under the Act; the licensee must also present evidence regarding "the remaining statutory requirements, namely the landowner's actual

or constructive knowledge of the danger, proximate cause, and damages." *Lombard*, 187 P.3d at 575.)

### III. Evidence of the Applicable Standard of Care

¶ 23 The parties dispute the meaning of the language in Durango's fire safety ordinance (the Durango fire code) that addresses the requirements for smoke alarms in buildings such as the unit. Specifically, they disagree about which smoke alarm requirements were relevant to the case and, thus, which requirements provided relevant evidence of whether the Adams parties exercised reasonable care.

¶ 24 The Adams parties contend that the court instructed the jury on the incorrect standard of care by providing it with a version of the Durango fire code that required a greater number of smoke alarms than were installed in the unit. We agree.

### A. Standard of Review

¶ 25 "Trial courts have a duty to correctly instruct juries on all matters of law," and appellate courts review de novo whether a particular jury instruction correctly stated the law. *Day v. Johnson*, 255 P.3d 1064, 1067 (Colo. 2011). An instructional error is harmless unless it prejudiced a party's substantial rights.

*Bullington v. Barela*, 2024 COA 56, ¶ 18, 555 P.3d 102, 106. "A party's substantial rights are prejudiced when the jury 'might have answered differently if a proper instruction had been given.'" *Id.* (quoting *Banning v. Prester*, 2012 COA 215, ¶ 10, 317 P.3d 1284, 1287).

¶ 26 Under the Act, a landowner breaches the standard of care by "unreasonabl[y] fail[ing] to exercise reasonable care." § 13-21-115(4)(b)(I). "[R]easonable care is measured by what a person of ordinary prudence would or would not do under the same or similar circumstances." *Lombard*, 187 P.3d at 574. To prove that a landowner failed to exercise reasonable care, a plaintiff may present "evidence that the landowner violated a statute or ordinance." *Id.* at 575. This is so because "a person of ordinary prudence would generally follow the law." *Id.* at 574. A plaintiff may also introduce evidence that a defendant failed to comply with a municipal safety code or regulation to establish a breach of the applicable standard of care. *See Scott v. Matlack, Inc.*, 39 P.3d 1160, 1167 (Colo. 2002).

¶ 27 In such cases, the court generally considers the version of the code or regulation in effect at the time of the plaintiff's injury. *See*

10

*Bennett v. Greeley Gas Co.*, 969 P.2d 754, 760 (Colo. App. 1998) (holding that a relevant safety code or regulation may be admissible if it "gives some indication of the standard of care at the time of the alleged negligence"); *see also Scott*, 39 P.3d at 1167 (explaining that, to be admissible as evidence of the standard of care, a safety statute "must be relevant"). *But see Lombard*, 187 P.3d at 575 (applying a municipal building code in effect at the time of construction to determine if a condition was dangerous when built).

¶ 28 "Interpretation of a municipal ordinance involves a question of law subject to de novo review." *MDC Holdings, Inc. v. Town of Parker*, 223 P.3d 710, 717 (Colo. 2010). We follow the "ordinary rules of statutory construction" when interpreting a city code. *Alpenhof, LLC v. City of Ouray*, 2013 COA 9, ¶ 10, 297 P.3d 1052, 1055.

¶ 29 "Our principal goal in interpreting . . . local government enactments is to determine and effectuate the intent of those who adopted those measures." *Kulmann v. Salazar*, 2022 CO 58, ¶ 16, 521 P.3d 649, 653. "To do so, we look first to the language employed, giving words and phrases their plain and ordinary meanings." *Id.* "In addition, we look to the entire legislative scheme

11

in order to give consistent, harmonious, and sensible effect to all of its parts, and we avoid constructions that would render any words or phrases superfluous or lead to illogical or absurd results." *Id.* "[W]e will not add words to a statute or subtract words from it." *Miller v. Crested Butte, LLC*, 2024 CO 30, ¶ 23, 549 P.3d 228, 234.

¶ 30　"If the language of the measure is unambiguous, then we apply it as written and need not resort to other tools of construction." *Kulmann*, ¶ 17, 521 P.3d at 653. In addition, "if the statutory language is clear and unambiguous, the language should not be subjected to a strained or forced interpretation." *City of Colorado Springs v. Securcare Self Storage, Inc.*, 10 P.3d 1244, 1249 (Colo. 2000).

### B.　The Regulation of Smoke Alarms

¶ 31　Local governments throughout the country can look to model codes for guidance when considering their own ordinances and statutes governing smoke alarms and other matters affecting the structures in their communities.

¶ 32　The International Code Council (ICC), which was founded in 1994 to "develop[] a single set of national model construction codes," ICC, *Who We Are*, https://perma.cc/XN22-PN2K,

12

promulgates numerous model codes, including model building codes, residential codes, and mechanical codes. ICC, *The International Codes (I-Codes),* https://perma.cc/4SGH-GSAR. The IFC is one of those codes. The ICC published the first IFC in 2000. It published and continues to publish new editions of the IFC every three years. ICC, 2015 IFC, Preface, https://perma.cc/8GUJ-255L.

¶ 33    The IFC separates its rules governing "fire alarm and detection systems," *id.* § 907, for "occupancies" such as the unit into two categories: (1) fire alarm systems and (2) single- and multiple-station smoke alarms. *Id.* § 907.2.9. The IFC generally requires installation of a fire alarm system in buildings more than three stories in height or with more than sixteen dwelling or sleeping units, subject to several exceptions not relevant here. *Id.* § 907.2.9.1. All other occupancies are the subject of the IFC's single- and multiple-station smoke alarm rules.

¶ 34    The Durango City Council (the City Council) has adopted various editions of the IFC.

13

## C.  The Smoke Alarm Requirements
## Applicable to the Unit

¶ 35    Because the parties disagree as to which Durango fire code ordinance provides evidence of the applicable standard of care, we provide a brief history of the City Council's adoption of ordinances governing smoke alarms.

¶ 36    Construction of the unit began in 1978 and concluded in 1979.  For purposes of the IFC, the unit was an "R-2" occupancy, with a kitchen and living room on the first floor and two bedrooms on the second floor.  *See* ICC, 2012 IFC § 202, at 36, https://perma.cc/Z5ET-LB5R (An "R-2 occupancy" is a residential occupancy "containing *sleeping units* or more than two *dwelling units* where the occupants are primarily permanent in nature, including: [a]partment houses . . . .").  Because of the unit's size, it was not required to contain a fire alarm system; rather, it was subject to Durango's regulations concerning single- or multiple-station smoke alarms.

¶ 37    When the unit was constructed, the applicable Durango building code was the 1976 Uniform Building Code (1976 UBC), which the City Council adopted in 1977.  Durango, Colo., Amended

14

Ordinance No. 1239 (1977). The 1976 UBC required that smoke alarms "be mounted on the ceiling or wall at a point centrally located in the corridor or area giving access to rooms used for sleeping purposes." Int'l Conf. of Bldg. Offs., 1976 UBC § 1310(a), at 90-91, https://perma.cc/ST2S-D5P9.

¶ 38 In 2005, the City Council adopted the 2003 edition of the IFC through Ordinance No. O-2005-33. Section 907.2.10.1.2 of the 2003 IFC required that smoke alarms be installed and maintained in R-2 occupancies (1) outside each separate sleeping area; (2) in each room used for sleeping purposes; and (3) in each story within a dwelling unit. ICC, 2003 IFC § 907.2.10.1.2, at 78-79, https://perma.cc/SH65-FK4L. Section 907.3.2.1 of the 2003 IFC specified that existing buildings "not already provided with single-station smoke alarms" must be provided with them consistent with the foregoing standard (the 2003 exception). *Id.* § 907.3.2.1, at 82.

¶ 39 Aunt entered into her lease agreement for the unit with CAI in May 2014. Because the 2003 IFC was Durango's fire code from 2005 until January 1, 2016, it was the edition of the IFC in effect in Durango when aunt signed her lease.

¶ 40     On December 1, 2015, the City Council adopted the 2012 IFC, effective January 1, 2016. Durango, Colo., Ordinance No. O-2015-30. Section 907.2.11.2 of the 2012 IFC contained the same requirements for the installation of smoke alarms in R-2 occupancies as did the 2003 IFC. 2012 IFC § 907.2.11.2, at 117-18.

¶ 41     However, in a new chapter entitled "Construction Requirements for Existing Buildings," the 2012 IFC said, as relevant here, that additional smoke alarms were not required when "*the code that was in effect at the time of construction* required smoke alarms and smoke alarms complying with those requirements are already provided" (the 2012 exception). *Id.* § 1103.8.1, at 185 (emphasis added). Because the 2012 IFC was in effect from January 1, 2016, through the end of 2017, it was the edition of the IFC in effect in Durango at the time the children were injured.

¶ 42     The below table summarizes the smoke alarm requirements for R-2 occupancies in Durango at the times relevant to this case:

| Years | Relevance | Code | Requirement |
|---|---|---|---|
| 1978-2005 | Construction | 1976 UBC | A smoke alarm centrally located in the corridor giving access to rooms used for sleeping purposes |
| 2006-15 | Lease executed | 2003 IFC | A smoke alarm outside each sleeping area, inside each bedroom, and on each story, with an exception for existing buildings "already provided with" smoke alarms |
| 2016-17 | Fire | 2012 IFC | Same requirement as 2003 IFC, with an exception for existing buildings "where the code that was in effect at the time of construction" required smoke alarms and the building complied with that code |

## D. Additional Procedural History

¶ 43 Before trial, the court granted summary judgment for the Adams parties, concluding that the children failed to establish "but for" causation. The children appealed. A division of this court reversed and remanded, holding that the issue of "but for" causation was triable. *Martinez v. Cast, LLC*, slip op. at 7-9 (Colo. App. No. 21CA0193, June 9, 2022) (not published pursuant to C.A.R. 35(e)). As relevant here, the division also directed the court

to determine which "code" applied to the children's claims. *Id.* at 17-19, 21. On remand, the children moved for a determination of a question of law regarding which "code" was relevant to determining the applicable standard of care.

¶ 44 The court ruled on that motion in an order dated June 7, 2023. It appeared to conclude that the 2012 IFC — the edition of the IFC in effect at the time the children were injured — was relevant evidence of the applicable standard of care. The court found that the phrase "the code that was in effect at the time of construction" in the 2012 exception only referred to earlier editions of the IFC, and not to earlier editions of non-IFC codes, such as building codes. Thus, the court reasoned, the 2012 exception did not apply because the unit complied with the 1976 UBC, but not with an edition of the IFC predating the 2012 edition. The court made this finding for two reasons: (1) "the structure and wording of the IFC codes (both 2003 and 2012 versions)" and (2) "public policy."

¶ 45 In considering the structure and text of the different editions of the IFC, the court reasoned that, when the IFC referred to non-IFC codes, it identified them by name. The IFC otherwise

18

referred to itself as "this code." According to the court, if the IFC drafters intended that the 2012 exception apply to *any* code containing smoke alarm requirements, such as the 1976 UBC, the IFC would have referenced such codes by name.

¶ 46 The court also noted that, as a matter of public policy, a broad reading of the 2012 exception would be "inconsistent with the general purpose of holding builders accountable for failing to meet the minimum standard of care." The court said that concluding "a builder can construct a building and, without consequence, never make any safety upgrades in fifty years so long as it was in compliance with any code in place fifty years ago" would be "absurd" and "unreasonable."

¶ 47 But later in its June 7 order, the court contradicted its earlier implication that the 2012 IFC was relevant evidence of the standard of care by finding that the Adams parties' alleged negligence occurred in 2014, when aunt signed her lease agreement, and not in 2017, when the fire occurred. It found that the 2003 IFC was the governing IFC edition when aunt signed her lease and, because the 2003 IFC "superseded" the 1976 UBC, the Adams parties were required to comply with the smoke alarm requirements contained in

the 2003 IFC before renting the unit to aunt. According to the court, their failure to do so was "the alleged negligence leading to the harm to [the children]." Thus, the court concluded that the 2003 IFC was relevant evidence of the standard of care.

¶ 48 At trial, the court provided the jury with an instruction quoting section 907.2.10.1.2 of the 2003 IFC. Under that section, four smoke alarms would have been required in the unit: one on the first floor, one in each bedroom, and one outside the bedroom doors. The court did not, however, instruct the jury on the 2003 exception, which said that existing buildings "*not already provided with*" smoke alarms must be furnished with them according to section 907.2.10.1.2. 2003 IFC § 907.3.2.1, at 82 (emphasis added).

### E. The Adams Parties Did Not Abandon Their Argument Regarding the Applicable Fire Code

¶ 49 As an initial matter, the children assert that the Adams parties "abandoned" their argument regarding the applicable fire code because the Adams parties said, in a motion filed before the first appeal in the case, that they had no intention of arguing that the

1976 UBC "is the code the jury is to apply to the number of smoke detectors required."  We disagree.

¶ 50     Nowhere did the Adams parties assert that they were abandoning their argument that the version of the Durango fire code in effect *at the time the children were injured* was the relevant evidence of the standard of care.  *See People v. Rediger*, 2018 CO 32, ¶ 39, 416 P.3d 893, 902 (explaining that waiver is the intentional relinquishment of a known right or privilege); *United States v. Adigun*, 703 F.3d 1014, 1021 (7th Cir. 2012) (noting that a party waives an issue by making an "intentional (and often strategic) choice" to remove it from controversy).

### F.     The Court Erroneously Provided the Jury with Language from an Inapplicable Edition of the IFC

¶ 51     In their answer brief, the children contend that the court properly instructed the jury with the 2003 IFC.  Alternatively, they assert that, if the 2012 IFC applies, we should follow the district court's interpretation of the 2012 exception.  Thus, we must first determine which edition of the IFC provided relevant evidence of the standard of care, and we conclude that the 2012 IFC did so.  We next consider the meaning of the 2012 exception and conclude that

21

it refers to any code, not solely any edition of the IFC, governing smoke alarms in effect at the time of construction. Finally, we address the implications of our interpretation for the relevant standard of care in this case.

### 1. The Applicable Edition of the IFC Was the One in Effect in Durango at the Time the Children Were Injured

¶ 52    The court erred by concluding that the 2003 IFC applied to the determination of the applicable standard of care because it was the "code" in effect at the time of the "alleged negligence," which the court said was the Adams parties' failure to install the requisite number of smoke alarms before they leased the unit to aunt.

¶ 53    The children did not allege that the dangerous condition existed when aunt signed her lease for the unit. Instead, they asserted that the determination of whether there was a dangerous condition at the unit must focus on the conditions on the night of the fire. *See* § 13-21-115(4)(b)(I) ("A licensee may only recover *damages caused . . . [b]y* the landowner's unreasonable failure to exercise reasonable care . . . .") (emphasis added). As a matter of logic, the children's claims under the Act were premised on a dangerous condition that existed at the time they were injured and

22

not on dangerous conditions on an earlier date. Thus, we must consider evidence of the standard of care — the smoke alarm requirements in Durango — at the time of the children's injuries.

¶ 54 Even if we were to conclude that the lease execution date was relevant to determining the applicable standard of care at the time of the "alleged negligence," the court overlooked the critical fact that, although aunt executed her initial lease for the unit in 2014, she renewed the lease in 2016, when the 2012 IFC was in effect in Durango.

¶ 55 We recognize that, in *Lombard*, 187 P.3d at 575, the Colorado Supreme Court referenced the municipal building code in effect at the time of construction as evidence of whether a permanent ladder giving access to a loft was a dangerous condition. In that case, which the plaintiff brought under the Act, the parties contested whether the plaintiff could point to such building code as evidence that the defendant failed to exercise reasonable care. *Id.* at 568. But unlike in this case, the parties in *Lombard* did not contest which version of the ordinance provided evidence of the standard of care at the time the plaintiff was injured. *Id.* at 575. Thus, *Lombard* did not address the question before us.

¶ 56 Thus, the 2012 IFC was the edition of the IFC relevant to the children's premises liability claim because it was the edition in effect in Durango when the children were injured.

### 2. The 2012 Exception Refers to Any Code — Not Solely Any Edition of the IFC — Governing Smoke Alarms in Effect at the Time of Construction

¶ 57 We must next determine the meaning of the 2012 exception — that the smoke alarm requirements in the 2012 IFC did not apply to existing buildings when (1) a code "was in effect at the time of construction"; (2) such code "required smoke alarms"; and (3) "smoke alarms complying with those requirements are already provided" in the building. 2012 IFC § 1103.8.1, at 185.

### a. The Language of the 2012 Exception

¶ 58 We conclude that "the code that was in effect at the time of construction" unambiguously means *any* code — not solely any edition of the IFC — containing a smoke alarm requirement that was in effect in the subject jurisdiction when the occupancy was constructed. The 2012 exception contains no qualifier suggesting that the code in effect at the time of construction must be an earlier IFC edition. Because the language of the 2012 exception is unambiguous, it should not be "subjected to a strained or forced

24

interpretation." *City of Colorado Springs*, 10 P.3d at 1249. And we will not add words to the 2012 exception that do not plainly appear in it. *See Miller*, ¶ 23, 549 P.3d at 234.

¶ 59 The 2012 exception's reference to a "code" that "required smoke alarms" would be superfluous if "code" only meant "edition of the IFC," as every IFC edition required smoke alarms. The inclusion of the qualifier "required smoke alarms" makes sense only if some "codes" did not require smoke alarms, and the 2012 exception therefore needed to distinguish between codes that did and did not require smoke alarms. This distinction tells us that "code" encompasses types of codes, such as building codes, that did not uniformly require the installation of smoke alarms in new buildings. *See Indus. Claim Appeals Off. v. Town of Castle Rock*, 2016 CO 26, ¶ 15, 370 P.3d 151, 155 (noting that courts avoid interpretations of statutes that render provisions superfluous).

¶ 60 Accordingly, the unambiguous language of the 2012 exception establishes that "code" means any code that required buildings to contain smoke alarms at the time of construction and not merely earlier IFC editions.

### b. The Text Surrounding the 2012 Exception and the Accompanying Commentary

¶ 61    The children assert that we cannot determine whether the 2012 exception applies to this case without also examining the text surrounding the 2012 exception and the accompanying commentary. *See Bryant v. Cmty. Choice Credit Union*, 160 P.3d 266, 274 (Colo. App. 2007) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997))); *People v. Bagwell*, 2022 COA 44, ¶ 19, 514 P.3d 953, 958 (explaining that, where no case has interpreted a Colorado statute premised on a model code, we refer to the model code and its commentary for guidance). The children argue that the surrounding text and commentary support their contention that the 2012 exception does not exempt existing buildings from the 2012 IFC's substantive smoke alarm requirements. We disagree.

¶ 62    As we explain below, the text surrounding and the commentary to the 2012 exception undermine the children's — and the court's — reading of the 2012 exception to mean that "the code

that was in effect at the time of construction" only means the IFC edition in effect at the time of construction.

¶ 63　　The 2012 IFC refers to itself as "this code." *See, e.g.*, 2012 IFC § 101.1, at 1 ("These regulations shall be known as the *Fire Code* of [NAME OF JURISDICTION], hereinafter referred to as 'this code.'"). The IFC generally refers to past versions of itself by identifying the year of the edition. *See, e.g.*, 2012 IFC, Preface, at iii ("This 2012 edition presents the code as originally issued, with changes reflected in the 2003, 2006 and 2009 editions . . . ."); *id.* at v ("Solid vertical lines in the margins within the body of the code indicate a technical change from the requirements of the 2009 edition."). These references demonstrate that the drafters knew how to limit the 2012 exception to buildings that complied with earlier IFC editions if they chose to do so.

¶ 64　　The court was correct that the IFC occasionally refers to non-IFC codes by name. But we do not agree with the court's conclusion that, if the drafters intended for the 2012 exception to apply to non-IFC codes, such as the 1976 UBC, the drafters would have referenced those codes by name, as they had in other parts of the 2012 IFC. Many of the pre-IFC codes containing smoke alarm

27

requirements were unique to specific jurisdictions. Given that the

IFC is a *model* fire code, adopted in numerous jurisdictions, we do

not see how the drafters could have feasibly identified by name all

the non-IFC codes it intended to include in the 2012 exception.

Instead, the drafters chose an unambiguous shorthand: "the code

that was in effect at the time of construction." That shorthand

makes sense, and we will not subject it to a strained interpretation

that yields a different result.

¶ 65      In addition, the IFC drafters' commentary to the 2012

exception undercuts the children's and the court's reading of the

2012 exception. The commentary explains:

> Three exceptions are also provided to address
> possible scenarios where smoke alarms have
> already been installed but the installation does
> not meet the current code requirements,
> recognizing that the intent of the code is to
> permit existing smoke alarm installations to
> continue unchanged where they meet the code
> that was *in effect at the time they were
> installed.* Exception 1 indicates that smoke
> alarms which have been installed and
> maintained in accordance with the *applicable
> code at the time of construction* can continue
> unchanged. . . . In summary, this section
> requires the installation of smoke alarms in
> Group . . . R occupancies that do not currently
> have *any* smoke alarms. It does not require
> compliance with the current smoke alarm

> requirements if the building already has smoke
> alarms that meet requirements that were
> applicable *when they were installed*. The focus
> here is not to have the owner replace or revise
> their smoke alarms any time the code
> requirements for new construction change.

ICC, 2012 IFC Code and Commentary § 1103.8.1, at 353 (emphases added).

¶ 66 These materials support our conclusion that "the code that was in effect at the time of construction" means *any earlier code* containing a smoke alarm requirement and is therefore not limited to earlier IFC editions. They establish that the drafters of the 2012 exception were concerned with buildings that were not required to have *any* smoke alarms when constructed.

¶ 67 Thus, limiting "the code that was in effect at the time of construction" to prior IFC editions would frustrate the drafters' intent to "permit existing smoke alarm installations to continue unchanged where they meet the code that was in effect at the time they were installed." *Id.* Of course, vast numbers of buildings were constructed before 2000, when the first IFC was promulgated. The court's interpretation would require all those buildings to be retrofitted, at unimaginable expense, to comply with the smoke

29

alarm requirements in the IFC edition then in effect in the applicable jurisdiction. Most significantly, this reading of the 2012 exception would be directly counter to the drafters' intent expressed in its plain language.

### c. The Children's Further Arguments Regarding the 2012 Exception

¶ 68 The children raise two further arguments supporting the court's interpretation of the 2012 exception: one regarding the exception's formatting and one resting on public policy considerations. We address and reject them in turn.

¶ 69 We are not persuaded by the children's contention that the 2012 exception only applies to sections 1103.8.2 and 1103.8.3 of the 2012 IFC, rather than to section 1103.8.1, under which it is nested. An image of the 2012 exception's placement within the 2012 IFC is instructive:

1103.8 Single- and multiple-station smoke alarms. Single- and multiple-station smoke alarms shall be installed in existing Group I-1 and R occupancies in accordance with Sections 1103.8.1 through 1103.8.3.

1103.8.1 Where required. Existing Group I-1 and R occupancies shall be provided with single-station smoke alarms in accordance with Section 907.2.11, except as provided in Sections 1103.8.2 and 1103.8.3.

Exceptions:

1. Where the code that was in effect at the time of construction required smoke alarms and smoke alarms complying with those requirements are already provided.

2. Where smoke alarms have been installed in occupancies and dwellings that were not required to have them at the time of construction, additional smoke alarms shall not be required provided that the existing smoke alarms comply with requirements that were in effect at the time of installation.

3. Where smoke detectors connected to a fire alarm system have been installed as a substitute for smoke alarms.

1103.8.2 Interconnection. Where more than one smoke alarm is required to be installed within an individual dwelling or sleeping unit, the smoke alarms shall be interconnected in such a manner that the activation of one alarm will activate all of the alarms in the individual unit. Physical interconnection of smoke alarms shall not be required where listed wireless alarms are installed and all alarms sound upon activation of one alarm. The alarm shall be clearly audible in all bedrooms over background noise levels with all intervening doors closed.

Exceptions:

1. Interconnection is not required in buildings that are not undergoing alterations, repairs or construction of any kind.

2. Smoke alarms in existing areas are not required to be interconnected where alterations or repairs do not result in the removal of interior wall or ceiling finishes exposing the structure, unless there is an attic, crawl space or basement avail-

Image 1: The image shows general rules titled in bolded text with exceptions to each general rule indented underneath. The challenged exception is circled in red font, and it is indented under section 1103.8.1. Section 1103.8.2 begins underneath and is left justified with a bolded title. It is followed by its own set of indented exceptions.

The formatting of sections 1103.8.1 and 1103.8.2 and the fact that section 1103.8.2 contains separate exceptions nested underneath it undermine the children's argument. Accordingly, the 2012 exception clearly is a carveout from section 1103.8.1's

31

language that "[e]xisting . . . R occupancies shall be provided with single-station smoke alarms in accordance with Section 907.2.11['s]" requirement that smoke alarms be installed and maintained (1) outside each separate sleeping area; (2) in each room used for sleeping purposes; and (3) in each story within a dwelling unit.

¶ 71    Finally, the children question, as a matter of public policy, the wisdom of excepting from the IFC's smoke alarm requirements those buildings that only complied with earlier codes in effect in the jurisdiction at the time of construction. Although the children's public policy concerns may have merit, they are a matter for the City Council, and not this court, to address. "[C]ourts must avoid making decisions that are intrinsically legislative. It is not up to the court to make policy or to weigh policy." *Town of Telluride v. Lot Thirty-Four Venture, L.L.C.*, 3 P.3d 30, 38 (Colo. 2000). We must interpret the 2012 exception as the City Council adopted it, consistently with its unambiguous language. *See Migoya v. Wheeler*, 2024 COA 124, ¶ 55, ___ P.3d ___, ___ ("[W]e must apply [statutes] as drafted. Our role is not to second-guess [legislative bodies'] policy decisions.").

¶ 72    In sum, we hold that the 2012 IFC carved out an exception from its smoke alarm standards for any building that complied with the smoke alarm standards in effect at the time of its construction, whether those standards appeared in an IFC edition or in another type of code, so long as those standards required the installation of smoke alarms.

### 3.    The 2012 Exception and the 1976 UBC Provide Relevant Evidence of the Applicable Standard of Care

¶ 73    As explained above, the version of the Durango fire code in effect at the time the children were injured — the 2012 IFC — carved out an exception to the IFC's smoke alarm requirements for buildings that complied with the smoke alarm requirements embodied in the code in effect when the building was constructed.

¶ 74    The 1976 UBC was in effect in Durango when the unit was constructed.  The 1976 UBC required that a smoke alarm be "mounted on the ceiling or wall at a point centrally located in the corridor or area giving access to rooms used for sleeping purposes." UBC § 1310(a), at 90-91.  The parties do not dispute that, when it was constructed, the unit complied with the 1976 UBC's smoke alarm requirements.

¶ 75    Thus, the code sections providing relevant evidence of the standard of care were the 2012 exception and section 1310(a) of the 1976 UBC.  For these reasons, we hold that the court erred by providing the jury with an instruction quoting section 907.2.10.1.2 of the 2003 IFC.  *See Bennett*, 969 P.2d at 760; *Scott*, 39 P.3d at 1167.  Because "the jury 'might have answered differently if a proper instruction had been given,'" *Bullington*, ¶ 18, 555 P.3d at 106 (citation omitted), the court's instructional error substantially affected the Adams parties' substantial rights and, therefore, was not harmless.

IV.    Ms. Adams's Status as a Landowner

¶ 76    Next, we address an issue likely to recur in the event of a retrial: CAI and Ms. Adams's contention that the court erred by finding that she was a "landowner" under the Act.

A.    Applicable Law and Standard of Review

¶ 77    "An injured person may bring a claim under the [Act] only against a 'landowner.'"  *Lopez v. Trujillo*, 2016 COA 53, ¶ 34, 399 P.3d 750, 756 (quoting § 13-21-115(3)), *aff'd sub nom. N.M. v. Trujillo*, 2017 CO 79, 397 P.3d 370.  "[T]he general assembly defined 'landowner' quite broadly . . . ."  *Pierson v. Black Canyon*

*Aggregates, Inc.*, 48 P.3d 1215, 1219 (Colo. 2002).  The term "encompasses both: (1) 'an authorized agent or a person in possession of real property'; and (2) 'a person legally responsible for the condition of real property or for the activities conducted or circumstances existing on real property.'" *Jordan v. Panorama Orthopedics & Spine Ctr., PC*, 2015 CO 24, ¶ 22, 346 P.3d 1035, 1041 (quoting what is now section 13-21-115(7)(b)); *see also Henderson v. Master Klean Janitorial, Inc.*, 70 P.3d 612, 614 (Colo. App. 2003) ("These definitions must be read in the disjunctive."). "Both statutory definitions confer landowner status on those who are responsible for the conditions, activities, or circumstances existing on real property." *Jordan*, ¶ 22, 346 P.3d at 1041.  A person need not hold title to property to be considered a "landowner." *Lopez*, ¶ 34, 399 P.3d at 756.

¶ 78     In considering the parties' arguments, we focus on the first statutory definition of a landowner: an authorized agent or a person in possession of real property.

¶ 79     "An agent is one who acts for or in the place of another by authority from him, or one who is entrusted with the business of another." *Digit. Landscape Inc. v. Media Kings LLC*, 2018 COA 142,

¶ 76, 440 P.3d 1200, 1212 (quoting *Governor's Ranch Pro. Ctr., Ltd. v. Mercy of Colo., Inc.*, 793 P.2d 648, 651 (Colo. App. 1990)). "As an inanimate entity, a corporation must act through agents." *Genova v. Longs Peak Emergency Physicians, P.C.*, 72 P.3d 454, 462 (Colo. App. 2003); *see also Colo. Coffee Bean, LLC v. Peaberry Coffee Inc.*, 251 P.3d 9, 29 (Colo. App. 2010).

¶ 80     "[A] person 'in possession of' land is one who occupies the land with intent to control it, although not necessarily to the exclusion of all others." *Jordan*, ¶ 23, 346 P.3d at 1041; *Pierson*, 48 P.3d at 1220. In holding that exclusive possession is not required, the *Pierson* court cited the Restatement (Second) of Torts (Am. L. Inst. 1965), which provided that a possessor of land includes "a person who is entitled to immediate occupation of the land, if no other person is in possession." 48 P.3d at 1220 (quoting Restatement (Second) of Torts § 328E).

¶ 81     A landlord is a "person in possession of real property" — and thus a "landowner" — if, as here, the lease for the property provides that the tenant "surrendered [her] right to exclusive possession and control over the property in such a way as to share control" with the landlord; the landlord "reserved the power or authority to manage,

36

superintend, direct, or oversee repairs on the premises"; and there is no evidence of "a pattern" that tenant maintained and repaired the property without notice to the landlord or that the landlord stopped inspecting the property. *Nordin v. Madden*, 148 P.3d 218, 220-21 (Colo. App. 2006).

¶ 82 "[T]he covenant to repair gives the landlord a right to enter the premises, and hence amounts to a retention of a degree of control." *Id.* at 220 (quoting Glen Weissenberger & Barbara B. McFarland, *The Law of Premises Liability* § 9.8, at 245 (3d ed. 2001)). "On the other hand, when a landowner transfers complete control of the premises to a lessee, that landowner is no longer a person in possession for purposes of the statute." *Pierson*, 48 P.3d at 1220.

¶ 83 "Whether a party is a landowner within the meaning of the [Act] is a mixed question of fact and law." *Lopez*, ¶ 33, 399 P.3d at 756. "We review a court's findings of historical fact for clear error" and "review de novo the ultimate legal conclusion that a party is a landowner." *Id.*

B.  Ms. Adams Is a Landowner within the Meaning of the Act

¶ 84  We conclude that Ms. Adams had a sufficient possessory interest in the unit to qualify as a landowner under the Act.  We reach this conclusion for two reasons.

¶ 85  First, Ms. Adams was CAI's authorized agent.  Ms. Adams purchased the unit in 2014 and then quitclaimed her interest in the unit to Cast.  That same year, Cast executed a management agreement with "Caroni Adams, Inc. d/b/a The Property Manager," authorizing it to "lease, operate and manage" the unit on Cast's behalf.  Ms. Adams signed the agreement on behalf of CAI in her capacities as its owner, real estate broker, and president.  In addition, Ms. Adams testified that she executed all the leases for, and inspected, the properties that CAI managed.  We conclude that this evidence was sufficient to demonstrate that Ms. Adams acted with authority as CAI's agent.

¶ 86  Second, CAI was in possession of the unit within the meaning of the Act.  The lease agreement between aunt and CAI provided, in relevant part:

- "If the premises are left vacant or [aunt] is evicted and any part of the rent herein reserved be unpaid, then [CAI]

38

may . . . without terminating this lease, retake possession of the said premises and rent the same."

- "[Aunt] shall report problems and repairs needed promptly within 24 hours to [CAI]."

- "[Aunt] shall permit [Cast], [its] Agent or [CAI] to enter the premises at reasonable times for the purpose of inspecting said property; provided, however, that [Cast or CAI] shall give reasonable notice to [aunt] of [its] desire to inspect the premises under the terms of this paragraph, except in case of an emergency situation which threatens the property . . . ."

- "[CAI] shall have the right to show the premises to prospective tenants during the last month of this tenancy."

- "[CAI] and/or [Cast] may show the property to purchasers, mortgagees, or appraisers with reasonable notice."

While the lease generally provided that aunt was responsible for routine maintenance of the unit, testimony at trial showed that CAI

performed repairs to the unit, as well as the other properties it managed.

¶ 87    The record establishes that CAI retained control over the unit by nature of its right to assume immediate possession upon the tenant's vacation or eviction, its duty to perform repairs at the unit, its right to enter the unit upon the conditions specified in the lease, and its right to show the unit to prospective tenants and other interested parties.  Moreover, the Adams parties did not introduce evidence of "a pattern" that aunt maintained and repaired the unit without notice to CAI or that CAI had stopped inspecting the unit. *See Nordin,* 148 P.3d at 221.

¶ 88    In sum, Ms. Adams was a landowner for purposes of the Act because CAI was "in possession" of the unit; Ms. Adams was CAI's "authorized agent" and the principal individual through whom CAI performed its duties as property manager for the unit; and Ms. Adams, in her capacity as CAI's authorized agent, "manage[d], superintend[ed], direct[ed], or overs[aw] repairs" at the unit, *id.* at 220-21.  § 13-21-115(7)(b).  In reaching this conclusion, we do not hold that Ms. Adams was CAI's alter ego.  The General Assembly intended that certain officers and agents of property owners,

managers, and similar entities could be deemed landowners under the Act through their role as "authorized agent[s] or . . . person[s] in possession of real property." § 13-21-115(7)(b). This statutory provision does not mean that, without more, these individuals can also be held personally liable for the entity's debts under an alter ego theory. *See Brightstar LLC v. Jordan*, 2024 COA 39, ¶ 122, 552 P.3d 1133, 1157.

## V.    Attorney Fees

¶ 89    Because we agree with the Adams parties that the court erred by providing the jury with an instruction containing the language of the 2012 IFC, we decline the children's request for an award of attorney fees. Under section 13-17-102(2), a court may award reasonable appellate fees in civil actions lacking substantial justification. The Adams parties' arguments do not lack substantial justification.

## VI.    Disposition

¶ 90    The judgment is reversed, and the case is remanded to the trial court for further proceedings consistent with this opinion.

JUDGE JOHNSON and JUDGE MOULTRIE concur.